UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

-------------------------

NO. 92-8356

-------------------------

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MICHAEL RENE PONCE,

Defendant-Appellant.

-------------------------

Appeal from the United States District Court for the
Western District of Texas

-------------------------
(November 23, 1993)

Before Emilio M. GARZA and DeMOSS, Circuit Judges, and ZAGEL[1],
District Judge.

ZAGEL, District Judge:

Michael Rene Ponce was convicted under 21 U.S.C. § 841(a)(1)
for possession of heroin with the intent to distribute. Ponce was
sentenced to 48 months in prison. He advances three grounds for
reversal of his conviction.

---

[1] District Judge of the Northern District of Illinois,
sitting by designation.

Ponce's conviction stems from two separate drug arrests. The first occurred on the night of November 10, 1990 in a high crime area in Austin, Texas. Officer Ivey Yancy of the Austin Police Department saw the driver of a car back up at a high rate of speed in front of a gas pump in what he considered to be a reckless manner. Thinking the driver might be intoxicated, Officer Yancy went to investigate. Yancy, who was driving a marked patrol car and wearing a uniform, approached the car and told the driver that he was being stopped for his driving. The driver of the car was defendant Ponce. At Officer Yancy's request, Ponce produced his driver's license and told the officer that the car was a rental. Officer Yancy radioed for a registration check on the car and a warrant check on Ponce. When the officer inquired about Ponce's employment, Ponce said he was unemployed.

A second officer, Officer Barber, pulled up in a marked patrol car while Yancy and Ponce were talking. Barber, basing his statement on his prior knowledge of Ponce, told Officer Yancy that Ponce might have a weapon. His suspicions further aroused, Yancy asked Ponce if they could search his car. Ponce answered "sure." Barber searched the car after Ponce consented, but found nothing. When asked or told that Officer Yancy was going to search him for weapons, Ponce said, "okay." Ponce removed his jacket at Yancy's request and handed it to the officer. Yancy checked its pockets and found a few one-dollar bills and a pager. Yancy also patted down Ponce's shirt pockets and checked around his waste and ankles.

After Officer Yancy had patted Ponce down, he was advised over his police radio that Ponce had just gotten out of jail and that Ponce might possess drugs.  Yancy then asked Ponce if he had ever been in the penitentiary, and Ponce said, "No."  Having failed to search Ponce's pants pockets the first time, Officer Yancy asked Ponce if he could pat him down again.  Ponce did not resist.  Feeling a bulge in Ponce's left front pocket, Yancy pulled out a wad of bills totalling $510 and containing 22 twenty-dollar bills, one ten-dollar bill, and some five-dollar bills.  Officer Yancy felt nothing in the right pants pocket, but in the "change" or "watch" pocket he felt something that rattled like paper.  Yancy removed the pocket's contents and found a cigarette paper containing a small amount of heroin.  After Yancy removed the heroin from his pocket, Ponce said, "Dang, I forgot it was there."

The second arrest at issue occurred on January 9, 1991.  On that day Officer Joe Nichols, a member of the Repeat Offender Division of the Austin Police Department, was advised by a parole officer that there was a parole violation warrant out for Ponce and that Ponce was at the parole office.  Officer Nichols, accompanied by another officer, went to the parole office and placed Ponce under arrest.  When the officers patted Ponce down they found a set of Ford keys in his pants pocket.  Ponce told the officers that he had driven a Ford pickup belonging to his brother-in-law, Mark Sosa, to the parole office.  Officer Nichols asked Ponce if there was anyone with him to whom they could release the truck.  Ponce

3

said his girlfriend, Lisa Lara, was in the waiting room and could take the truck.

The officers, Ponce and Lisa Lara exited the parole office. When Officer Nichols asked Ponce where the truck was, Ponce looked around the parking lot and said the truck was gone and that someone must have taken it. Officer Nichols looked to his left and saw a white Ford pickup. He found the passenger door of the truck unlocked, got in, and started the pickup with the keys that had been in Ponce's pocket. A license plate check showed that the truck was registered to Mark Sosa. Ponce then acknowledged that the truck was his brother-in-law's.

After learning that Lisa Lara did not have a driver's license and could not drive the truck, Officer Nichols decided to impound the truck. Officer Nichols inventoried the truck to note exterior damage and any contents in areas of the truck that would be accessible to the wrecker company. He found 86 small balloons of heroin rolled up and tied in a plastic baggie in the truck's ashtray.

## II.

Ponce's first argument on appeal is that the district court erred in admitting evidence of his prior conviction for possession of methadone because he made an offer to stipulate to intent. Ponce contends that in light of his proposed stipulation, the district court's admission of evidence of the prior conviction

4

violated Rule 404(b), Fed. R. Evid.[2]  In accordance with the rule, the government provided notice before trial that it intended to introduce evidence of Ponce's prior possession of methadone conviction, arguing that it was relevant to Ponce's intent and knowledge.

During a recess on the first day of trial, Ponce's counsel announced: "we are willing to stipulate that if the trier of fact finds that the defendant was, in fact, in possession of the contraband in these cases, Count One and Count II, then the defense is going to stipulate that in that event we are stipulating that he was also in possession with intent to deliver."  During the same colloquy Ponce's counsel said, "[a]nd I think we are offering to stipulate that if they do find he was guilty of possession in that case, we stipulate that he is also guilty of possession with intent to deliver."  Defense counsel argued that the prior conviction was not relevant because it involved a different controlled substance. Admission of the prior conviction, according to defense counsel, "merely lets the jury decide that he's been a bad boy before, so he is a bad boy again."  Although the trial court repeatedly expressed

---

[2]  Rule 404(b) provides:

> Other crimes, wrongs, or acts. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Fed. R. Evid. 404(b).

5

uncertainty over defense counsel's stipulation proposal and its purpose, counsel failed to clarify the stipulation or submit a proposed jury instruction that might have clarified his position. The district court overruled defense counsel's objection to the admission of Ponce's prior conviction.

We determine the admissibility of extrinsic offense evidence by applying a two-part test. First, the extrinsic offense must be relevant to an issue other than the defendant's character. Second, the probative value of the extrinsic offense evidence must not be substantially outweighed by its prejudicial effect. United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978), cert. denied, 440 U.S. 920 (1979). Ponce does not contend that the trial court should have excluded his prior conviction under Beechum regardless of its ruling on the proposed stipulation. Rather, he argues that had the court accepted his proposed stipulation, the extrinsic offense evidence would have been sapped of its probity. With Ponce's unlawful intent no longer in dispute, the probative value of the prior conviction would be substantially outweighed by its prejudicial impact and thus rendered inadmissible under Rule 404(b). Thus, the success of Ponce's Rule 404(b) argument hinges on whether the trial judge properly refused to accept the proposed stipulation.

We conclude that the district court did not abuse its discretion by rejecting the proposed stipulation offered by Ponce's trial counsel. This Court has long held that "as a general rule a party may not preclude his adversary's proof by an admission or

6

offer to stipulate." United States v. Spletzer, 535 F.2d 950, 955 (5th Cir. 1976). United States v. Yeagin, 927 F.2d 798 (5th Cir. 1991) represents an exception to the general rule announced in Spletzer. In Yeagin, a stipulation similar to the one offered here was rejected and the trial court admitted evidence of nine prior felony convictions, four of which the government conceded on appeal were irrelevant to any issue. Id. at 800-01. We reversed the conviction because "the prosecutor's need to introduce evidence of Yeagin's nine prior convictions was negligible in comparison to the extremely prejudicial effect that this evidence must have had on the jury." Id. at 803.

This case is not like Yeagin. Yeagin presupposes a proper offer to stipulate. The language of the proposed stipulation offered by Ponce's trial counsel was never precisely defined. Also, the Yeagin Court disapproved of the government's arguing for the first time on appeal that the prior convictions were admissible because they tended to prove elements other than those to which the defendant had agreed to stipulate. Id. at 802. Here, by contrast, the government explicitly argued below that Ponce's prior conviction was relevant to knowledge, as well as to the element of intent to which Ponce was willing to stipulate. Furthermore, the Court in Yeagin concluded that the prior conviction evidence was "irrelevant to the knowledge required for actual possession because there was no evidence that indicated that Yeagin had direct physical control over the drugs." Id. Here, the police found the drugs in Ponce's pocket and his prior conviction for possession of

a controlled substance is relevant to his knowledge that possession of heroin is illegal.  That the prior conviction involved methadone and this one involves heroin is not sufficient to render the prior conviction irrelevant on the question of knowledge.[3]

There is another important fact that distinguishes this case from Yeagin.  As the government aptly put it, Yeagin is a prime example of prior conviction overkill.  The multiplicity of the other crimes evidence in Yeagin magnified its prejudicial effect.  In this case, the trial court admitted evidence of one prior conviction and that evidence was relevant to knowledge--one of the "other purposes" for which other crimes evidence may be admitted under Rule 404(b).  Under these circumstances, any danger of unfair prejudice was sufficiently mitigated by the trial court's instruction to the jury, which properly limited the jury's consideration of the prior conviction to intent and knowledge.

### III.

In his second argument on appeal, Ponce maintains that the district court erred in denying his request to suppress the heroin seized from the ashtray of the pickup truck.  Although it did not raise the issue below, the government now maintains that Ponce does

---

[3]  See United States v. Lindell, 881 F.2d 1313, 1319 (5th Cir. 1989) (in marijuana distribution conspiracy prosecution, evidence of defendants' personal cocaine use "demonstrated their familiarity with illicit drugs and was therefore relevant on the question of knowledge), cert. denied, 493 U.S. 1087 (1990); United States v. Contreras, 602 F.2d 1237, 1240 (5th Cir.) (in prosecution for heroin distribution, evidence that defendant used cocaine after heroin transaction "demonstrated appellant's familiarity with illicit drugs and was therefore relevant on the question of knowledge"), cert. denied, 444 U.S. 971 (1979).

8

not have standing to challenge the search of the truck. The Supreme Court has held that when the government fails to challenge facts from which it could reasonably infer a defendant's standing, it waives the issue for purposes of appeal. Steagald v. United States, 451 U.S. 204, 208-12 (1981). Conversely, the government may challenge standing for the first time on appeal when "no facts were adduced [below] from which the government could reasonably have inferred the existence of the defendant's standing." United States v. Cardona, 955 F.2d 976, 982 (5th Cir.), cert. denied, 113 S.Ct. 381 (1992).

We hold that the government could reasonably have inferred the existence of Ponce's standing from the facts adduced in the trial court. Ponce told the arresting officers that the truck he drove to the parole office belonged to his brother-in-law, Mark Sosa. A license plate check run by the officers confirmed Ponce's assertion. This Court has repeatedly held that when "a person has borrowed an automobile from another, with the other's consent, the borrower becomes a lawful possessor of the vehicle and thus has standing to challenge its search." United States v. Kye Soo Lee, 898 F.2d 1034, 1038 (5th Cir. 1990) (citing United States v. Martinez, 808 F.2d 1050, 1056 (5th Cir.), cert. denied, 481 U.S. 1032 (1987); see also United States v. Rose, 731 F.2d 1337, 1343 (5th Cir.) (same), cert. denied, 469 U.S. 931 (1984). There is no evidence in the record as to whether Ponce's brother-in-law consented to Ponce's use of his pickup truck. Nevertheless, Ponce's possession of the truck and his lack of guile when

9

identifying its owner provided a sufficient factual basis from which the government could reasonably infer his standing to challenge the search of the truck.[4]

Ponce raises three points of error with regard to the search of the pickup truck. He argues that Officer Nichols' opening of the ashtray in the pickup truck violated his rights under the Fourth Amendment because: (1) the search of the truck exceeded the scope of an inventory search and was a pretext for a search for evidence; (2) the search did not follow standardized procedures; and (3) there was no need under the police department's policies to impound the truck at all. We will address each of Ponce's challenges guided by well settled principles. We review a district court's findings of fact on a motion to suppress under the clearly erroneous standard. United States v. Basey, 816 F.2d 980, 987 (5th Cir. 1987). Moreover, in reviewing a district court's ruling on a motion to suppress, the Court views all the evidence, whether taken at the suppression hearing or at trial, in the light most favorable

---

[4] There is not enough in the record to support the government's assertion that Ponce abandoned the pickup by "insist[ing] that the truck in the parking lot was not the truck he had driven" to the parole office. Appellee's Brief at 27. Rather, it appears that Ponce did not immediately identify the vehicle for the arresting officer, but after the officer spotted a pickup in the parking lot and started it with the keys found in Ponce's pocket, Ponce acknowledged that the truck was his brother-in-law's. This is not sufficient to constitute abandonment. Cf. United States v. Roman, 849 F.2d 920, 922 (5th Cir. 1988) (defendant who repeatedly disclaimed knowledge and ownership of suitcases checked at airport voluntarily abandoned luggage and thus lacked standing to complain of a search and seizure).

10

to the prevailing party.  United States v. Rideau, 969 F.2d 1572, 1576 (5th Cir. 1992) (en banc).

The record does not support the conclusion that Officer Nichols exceeded the scope of an inventory search or failed to follow standardized procedures when he searched the truck's ashtray.  The Austin Police Department had standardized, written procedures for impoundment and inventory of cars.  The police department procedures included a policy authorizing an officer to inventory the contents of the vehicle "in unlocked compartments."  The ashtray of the truck was an unlocked compartment and Officer Nichols had no way of knowing whether the owner of the truck used the ashtray to store personal items.  Since the ashtray was accessible to the wrecker company that later towed the truck, Nichols' search complied with the police department's standardized procedures and was consistent with legitimate purposes for inventory searches, which include the protection of the owner's property and avoidance of police liability for loss.  Colorado v. Bertine, 479 U.S. 376, 372 (1987).  Since Ponce has failed to show that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation, the search was reasonable under the Fourth Amendment.  Id. at 372-74.[5]

---

[5]  Contrary to Ponce's assertion, Austin's police department procedures are sufficiently specific to protect citizens' Fourth Amendment rights and at the same time further the "police caretaking procedures designed to secure and protect vehicles and their contents" identified in Bertine, 479 U.S. at 372.  True, Austin's police procedures allow an officer to exercise discretion in deciding precisely where to search.  But the Supreme Court's decisions do not "prohibit[] the exercise of police discretion so long as that discretion is exercised according to standard criteria

11

Furthermore, Officer Nichols' decision to impound the pickup truck did not contravene the Austin Police Department procedures. The procedures authorized impoundment when "[t]he operator has been arrested and there is no responsible adult present to immediately take custody of the vehicle." The procedures also stated that when "the owner/operator of a vehicle has been arrested, the arresting officer will afford him/her the opportunity to release the vehicle to another person who is present provided that the person is capable of providing custody or removal of the vehicle." Ponce contends the because there is no evidence he was operating the vehicle at the time of his arrest, it cannot be said that he was the "operator" of the truck. We decline to construe the term "operator" in the extremely narrow way that Ponce's argument requires.[6] Ponce had the keys to the truck in his pocket and he told the arresting officer he drove the truck to the parole office.

_____

and on the basis of something other than suspicion of evidence of criminal activity." Id. at 375. Those requirements are met here.

[6]Our holding does not, as the dissent suggests, stand for "the proposition that, if a person who is arrested has keys to a vehicle in his pocket, the arresting officer may locate that vehicle and impound and search it, even though the person arrested was not in the vehicle at the time of arrest." In this case, Officer Nichols arrested Ponce at the Austin parole office, asked him whether he had driven to that location, received an affirmative answer, found car keys in his pants pocket, and then ascertained that the vehicle was in an open public parking lot adjoining the parole office building. Apparently, if Ponce had left the parole office, entered his truck, turned the ignition key, and then been arrested, the dissent would find the officer's decision to impound the truck less objectionable. We see no significant distinction between the two situations, nor any reason to construe "operator" so narrowly as to permit impoundment in the latter, but not the former.

12

That is enough to make Ponce an operator of the truck under Austin's police procedures.

Next, Ponce asserts that the truck should not have been impounded because it "did not fall under the types of vehicles that may be impounded under Opperman." Appellant's Brief at 10. In South Dakota v. Opperman, 428 U.S. 364, 368 (1976), the Supreme Court recognized that automobiles are impounded "[i]n the interests of public safety and as part of what the Court has called 'community caretaking functions . . .'" The Court in Opperman listed a few examples of when impoundment of vehicles is warranted. Id. at 369. Essentially, Ponce argues that since the Opperman court did not make a specific reference to impoundment of vehicles in public parking lots, the impoundment in this case must be unlawful. This argument assumes that the Opperman court intended to make an exhaustive list of appropriate impoundment scenarios--an assumption that the opinion in Opperman does not support. We agree with the government that the impoundment in this case falls within police officers' "community caretaking functions." By impounding Ponce's brother-in-law's truck, Officer Nichols ensured that the truck was not left in a public parking lot where it could have become a nuisance, and where it could have been damaged or stolen.

Finally, Ponce contends that the arresting officer should have released the truck to Ponce's girlfriend, Lisa Lara, rather than impound the vehicle. Ponce is correct that the Austin police procedures could be interpreted to mean that Officer Nichols should have released the truck to Lara, a "responsible adult" who could

13

arguably have taken custody of the vehicle upon Ponce's arrest. But the evidence, when viewed in the light most favorable to the government, does not compel such a conclusion. The truck was parked in a public lot when the officers arrested Ponce. Although Lara offered to take custody of the truck, she also informed Officer Nichols that she had no driver's license and could not operate the truck. Officer Nichols also knew that Ponce did not actually own the truck. Even if the officer believed that Mark Sosa had entrusted the truck to Ponce, his brother-in-law, he was not required to assume that Sosa would entrust the truck to Lara. Under these circumstances, the district court did not err in concluding that officer Nichols "acted appropriately and legally when he decided to impound and inventory Ponce's truck . . ."

IV.

In his third and final issue on appeal, Ponce argues that the trial court erred by failing to suppress the evidence seized as a result of Officer Yancy's search of his person. This issue turns on whether Ponce consented to the search and, if so, whether the scope of the search exceeded his consent. The district court found that Officer Yancy asked Ponce twice whether he could search him for weapons, and that Ponce, in response to the first request, expressly consented to a search for weapons. In response to the second request, Ponce did not resist. Citing Bumper v. North Carolina, 391 U.S. 543 (1968), Ponce argues that his failure to resist Yancy's second request to search is not adequate consent

14

because it constitutes "mere acquiescence" to a claim of unlawful authority.

In Bumper, an investigating officer announced that he had a warrant to search the home of the suspect's grandmother, Mrs. Hattie Leath. Id. at 1791. Although the officers did apparently have a warrant, it "was never returned, and there [was] no way of knowing the conditions under which it was issued, or determining whether it was based upon probable cause." Id. at 1792 n.15. The prosecution, therefore, relied on Mrs. Leath's consent to the search, but the Court held that an officer proclaiming that he has a warrant coerces cooperation rather than obtaining consent because he "announces in effect that the occupant has no right to resist the search." Id. at 1792.

Officer Yancy's conduct in this case fails to even approach such a bold declaration of authority. The district judge found that when asked or told that Officer Yancy was going to search him for weapons, Ponce said, "okay." There is no finding that the Officer made an express claim of authority to search or that his conduct implied that Ponce had no right to resist.

The government has the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given. United States v. Hurtado, 905 F.2d 74, 76 (5th Cir. 1990) (en banc), citing United States v. Matlock, 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 996 n. 14, 39 L.Ed.2d 242 (1974). As the district court's resolution of the voluntariness issue is a finding of fact, it is reviewed only for clear error. United States v. Gonzales, 842 F.2d

15

748, 754 (5th Cir. 1988), overruled on other grounds, <u>Hurtado</u>, 905 F.2d at 75-76.  Voluntariness is determined by the totality of all the circumstances, <u>id</u>., citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226, 93 S. Ct. 2041, 2047, 36 L.Ed.2d 854 (1973), and we generally focus on six factors in determining whether consent to a search was voluntary:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

<u>United States v. Gonzalez-Basulto</u>, 898 F.2d 1011, 1013 (5th Cir. 1990); <u>Gonzales</u>, 842 F.2d at 754; <u>United States v. Olivier-Becerril</u>, 861 F.2d 424, 426 (5th Cir. 1988).  No one of the six factors is dispositive or controlling of the voluntariness issue. <u>Gonzales</u>, 842 F.2d at 754; <u>Olivier-Becerril</u>, 861 F.2d at 426. Specifically, proof that the suspect knew of his right to refuse consent, while relevant, is not required to show voluntariness.[7]

_____

[7] <u>Schneckloth</u>, 412 U.S. at 248; <u>Olivier-Becerril</u>, 861 F.2d at 426.  In <u>Schneckloth</u>, the Supreme Court discussed at length the distinction between the requirements for a valid waiver of rights at trial and a valid consent to a non-custodial search.  412 U.S. at 243 n.31.  The Court held that "it would be next to impossible to apply to a consent search the standard of 'an intentional relinquishment or abandonment of a known right or privilege.'" <u>Id</u>. at 243, quoting <u>Johnson v. Zerbst</u>, 304 U.S. 458, 58 S. Ct. 1019, 82 L.Ed. 1461 (1938).  In addition to justifying "a diluted form of 'waiver'" based on the practicalities of a consent search, <u>id</u>. at 243-45, the Court also said that "There is nothing constitutionally suspect in a person's voluntarily allowing a search. . . . [U]nlike those constitutional guarantees that protect a defendant at trial, it cannot be said every reasonable presumption ought to be indulged against voluntary relinquishment." <u>Id</u>. at 243.  Indeed, the Court

Applying these factors to this case, we note first that here, as in Gonzales, although the defendant had been seized for Fourth Amendment purposes, he was not in official custody when consent to search was given. See Gonzales, 842 F.2d at 755 (relying, in part, on this distinction in finding consent valid). Second, the district court found that the officers "did not act in a threatening manner or coerce Ponce into consenting." Third, the court concluded that Ponce expressly consented to the first pat down, and did not resist the second.

Fourth, based on Ponce's three prior convictions and consequent experience with law enforcement procedures, the court believed that Ponce was familiar with his right to refuse consent. Such experience in the criminal justice system can offset "any weight" accorded to an officer's failure to advise a suspect of his right to resist a search. United States v. Galberth, 846 F.2d 983, 988 (5th Cir.), cert. denied, 488 U.S. 865, 109 S.Ct. 167, 102 L.Ed.2d 137 (1988). See also United States v. Garcia, 496 F.2d 670, 673 (5th Cir. 1974), cert. denied, 420 U.S. 960 (1975) (officers are not required to tell suspect that he has the right to refuse consent).

Fifth, at the hearing on Ponce's motion to suppress, no evidence was presented regarding his education and intelligence, and the court made no finding on this subject. The district court

_____

quoted its decision in Coolidge v. New Hampshire, 403 U.S. 443, 488, 91 S. Ct. 2022, 2049, 29 L.Ed.2d 564 (1971), noting that "it is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals."

17

did, however, observe the demeanor of all witnesses, and we do know, that in Ponce's presentence report, the probation officer described Ponce "as being a bright and articulate young man."

Finally, and compellingly, the district court found that after Yancy discovered the heroin in Ponce's watch pocket, Ponce said "Dang, I forgot it was there." This statement strongly supports the inference that Ponce expected Yancy to find no incriminating evidence on his person. Ponce neither disclaimed nor explained this statement at his suppression hearing and has done neither in his briefs on appeal.

Based on the foregoing, we cannot find clear error in the district judge's conclusion that Officer Yancy searched Ponce pursuant to voluntary consent sufficient under the law of this circuit. While Ponce's testimony at the suppression hearing contradicted Yancy on several points (including whether Yancy asked Ponce for permission to conduct a weapons search and whether Yancy coerced Ponce by threatening to obtain a search warrant), this merely indicates that the district court had to make a credibility determination. The court found Yancy more credible. It is not the role of this court to choose which witnesses to believe. See United States v. Martin, 790 F.2d 1215, 1219 (5th Cir.), cert. denied, 479 U.S. 868 (1986). Since the record contained credible evidence that Officer Yancy asked Ponce for consent to a weapons search and that Ponce expressly consented to such a search, the district court's findings are not clearly erroneous.

18

Ponce's express consent to Officer Yancy's initial request to search for weapons extends to Yancy's second pat down search. The second pat down, which included Ponce's pants pockets and the watch pocket in which the heroin was found, came only after Yancy realized his first search had not included a pat down of those pockets. Thus, Yancy was merely completing the weapons search to which Ponce had already expressly consented. Yancy's second request for consent to a weapons search was therefore superfluous. That Ponce failed to respond to Yancy's second request for consent is not determinative.

According to Ponce, even if he consented to a weapons search, the second pat down Officer Yancy conducted, which led to the discovery of the heroin in Ponce's watch pocket, exceeded the scope of his consent and was actually a search for contraband. The government's responses to this assertion, when considered together, demonstrate that the search was constitutionally permissible. The government attacks Ponce's challenge head on, contending that Officer Yancy's search of the watch pocket did not exceed the scope of Ponce's consent. Though the question is a close one, we hold that the evidence, when viewed in the light most favorable to the government, supports this conclusion. We have noted that Ponce consented to the removal of the contents of his left pocket, which contained cash, and made no protest to removal of the contents of his watch pocket. See Gonzalez-Basulto, 898 F.2d at 1013 (defendant's failure to protest at any time considered evidence that search did not exceed consent). And Ponce's blurting out,

"Dang, I forgot it was there," bolsters the conclusion that Ponce consented to the search of his watch pocket because he truly believed the police would find nothing incriminating.[8]

We do not endorse the government's view that Yancy's removal of the contents of Ponce's watch pocket was permissible as part of a protective search for weapons under Terry v. Ohio, 392 U.S. 1, 26 (1968). Indeed, the Supreme Court's recent decision in Minnesota v. Dickerson, 113 S.Ct. 2130 (1993) persuades us that such a conclusion would be erroneous. In Dickerson, during a Terry stop and frisk, the police officer felt a small lump in the defendant's jacket pocket. The officer squeezed and slid his fingers over the lump, recognized the lump as crack cocaine, then reached into the defendant's pocket and retrieved a small plastic bag containing one fifth of a gram of crack. Id. at 2133-34. In analyzing the constitutionality of the search, the Court recognized the validity of what some have termed the "plain feel" doctrine. "If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspects's privacy beyond that already authorized by the officer's search for weapons" under Terry. Id. at 2137. Applying the newly anointed doctrine to the facts, the Court said that while Terry allowed the officer to pat down the defendant's jacket and feel the lump, the lower court "determined that the incriminating character of the object was not

_____

[8] Given our ruling based on consent and good faith, we need not reach the government's argument that the search of Ponce's watch pocket was a legal search incident to arrest.

20

immediately apparent to him." Id. at 2139. "[T]he officer determined the item was contraband only after conducting a further search, one not authorized by Terry or by any other exception to the warrant requirement." Id. Since the further search of the defendant's jacket was constitutionally infirm, "the seizure of the cocaine that followed is likewise unconstitutional." Id.

As in Dickerson, the contraband nature of the contents of Ponce's watch pocket was not "immediately apparent" to Officer Yancy. Yancy's pat down of the watch pocket revealed only a "little bump." At that point, Officer Yancy's search may have reached the bounds marked by Terry, which allow a protective search "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." Terry v. Ohio, 392 U.S. 1, 26 (1968). His further fingering of the bump revealed something "squishy" that he believed might have been folded dollar bills. Even if the officer's further probing were part of a protective search, Officer Yancy's testimony belies any notion that he immediately recognized the bump as contraband. At best, based on his general experience as a policeman, Yancy believed the "little bump" might be folded dollar bills containing a razor blade. Under Dickerson, Yancy's speculation about what the bump might be is insufficient to justify his seizure of the contents of Ponce's watch pocket.

This is not to say the government could never prove that a police officer's protective search might properly include seizure of an object that feels like a wad of folded bills concealing a

21

weapon.  The record here simply does not support such a finding. Yancy did not say he felt something that felt like a weapon wrapped in currency or some other form of paper.  Rather, he testified that he was aware that razors are sometimes concealed in folded bills and that such razors have been used against police officers.  And except for Yancy's testimony, the government did not offer any evidence to bolster the assertion that weapons are sometimes concealed in folded bills and used against officers.[9]

The judgment of the district court is affirmed.

**DeMOSS, Circuit Judge, dissenting:**

I cannot concur with the language or the result reached by my colleagues in part III and IV of the panel opinion; and write this dissent to express my contrary views as to each of those parts.

First of all, the critical issue in part III is the question

---

[9]   The prosecution could have reinforced the evidence concerning hidden razor blades by following the example set in United States v. Robinson, 471 F.2d 1082, 1100 (D.C. Cir. 1972), rev'd, 414 U.S. 218 (1973).  There, the government offered the testimony of a police sergeant and an expert in clandestine weaponry to establish that a Terry type frisk is not sufficient to provide reasonable protection to an arresting officer.  The police sergeant discussed the array of weapons encountered during in-custody searches.  During his testimony, the weapons expert removed from his person 25 concealed weapons that could kill or incapacitate.  Id.  Similarly, Yancy's testimony could have been corroborated by the testimony of other Austin police officers or a weapons expert to prove the existence of a practice in the relevant geographical area of hiding weapons in folded currency.

22

of the constitutional propriety of the impoundment of the pickup truck. The second sentence of Section 5.04.01 of the general regulations of the City of Austin about impoundment of vehicles states: "Officers may initiate impoundment of a vehicle <u>if such impoundment is necessary</u> to facilitate or expedite a particular law enforcement or investigative action." (emphasis added). The panel majority do not mention this sentence anywhere in their opinion; but I think it is critically important in that it sets, at the very beginning of the city's regulations, the concept of "necessity." Under the facts of this case, I think it was clearly <u>not</u> "necessary" for officer Joe Nichols to impound the pickup truck. Officer Nichols' "particular law enforcement action" was to effect the arrest of Ponce; and he had Ponce in handcuffs and in custody without coming anywhere near the truck, or even knowing that the truck existed. Furthermore, Section 5.04.05 of the regulations identifies seven circumstances under which an officer may impound a vehicle: When the vehicle has been, ".1" abandoned, ".2" stolen, ".3" imperiled by "reason of catastrophe, emergency, or unusual circumstances," ".4" parked illegally, ".5" involved in a crime during or after the commission, ".6" ordered to be towed, or ".7" "The operator has been arrested, and there is no responsible adult present to immediately take custody of the vehicle. (<u>See</u> <u>also</u> Section 5.04.07 -- Alternative to Impoundment.)" Clearly, the first six of these circumstances specify situations where the circumstance authorizing impoundment relates to the vehicle itself. Applying a rule of <u>ejusdem</u> <u>generis</u>, I think the words "the operator has been arrested" in the .7th circumstance, clearly should be read

as contemplating the circumstance when the arrest occurs at the time the party being arrested was actually operating the vehicle. The panel opinion brushes this contention under the rug by saying simply that: "We decline to construe the term `operator' in the extremely narrow way that Ponce's argument requires." But it seems to me that when courts are called upon to construe regulations which authorize the police to seize, search, and impound private property, they should construe such regulations strictly and narrowly. Additionally, the panel opinion states that because Ponce had the keys to the truck in his pocket and drove it to the probation office, "that is enough to make Ponce an operator of the truck under Austin police procedures." (emphasis added). The phrase in sub-part .7 says "the operator," not "an operator"; and in my view requires the interpretation that at the time of arrest, the party being arrested is "the operator" of the vehicle. Certainly, when Ponce was sitting in the probation office, no one would describe him as the "the operator" of the truck.

The primary test contemplated by the Fourth and Fourteenth Amendments regarding search and seizure is one of "reasonableness." Both sub-part .7 of Section 5.04.05 and Section 5.04.07 contemplate a "reasonable alternative" to impoundment when there is a "responsible adult present to immediately take custody of the vehicle." The testimony at the suppression hearing clearly shows that Ponce's girlfriend accompanied him to the probation office, that she was present in that office when Ponce was arrested, that Ponce requested that custody of the vehicle be turned over to her,

**24**

and that the arresting officer declined to do so only because she did not have a driver's license. There is nothing in the testimony that indicates the girlfriend did not meet the test of "responsible adult"; and while she may not have been able to personally drive the truck away, there is nothing in the record to indicate that she was not mentally or physically "capable" of providing custody of the vehicle as it sat on the parking lot of the office building until she could make arrangements for someone else to come and drive or tow the vehicle away. Therefore, what was clearly contemplated by the city's regulations was that no impoundment would be effected in these circumstances; and that the arresting officer would simply note in his report that Ponce directed that custody of the truck be turned over to his girlfriend and that the keys to the truck were given to her. In my view, that was the common sense, reasonable thing to do. There was no need for the arresting officer to impound the vehicle; and, the decision of officer Nichols to seize the vehicle was not required under the rules and regulations of the City of Austin and was unreasonable in the Fourth and Fourteenth Amendment sense.

Affirmance of impoundment under the facts of this case will establish bad precedent. By approving the impoundment of the vehicle in this case, the panel decision will stand for the proposition that, if a person who is arrested has keys to a vehicle in his pocket, the arresting officer may locate that vehicle and impound and search it, even though the person arrested was not in the vehicle at the time of arrest. The Supreme Court has always

**25**

insisted that exceptions to the Fourth Amendment warrant requirement be limited and specific. In my view, the exception which the Supreme Court has recognized permitting the impoundment of vehicles without a warrant should be kept limited to the specific circumstances where there is a necessity (an "exigency" to use the new terminology) or where there is a relationship (a "nexus" to again use the new terminology) between the vehicle to be impounded and the circumstances justifying impoundment or arrest of the operator. No such exigency or nexus exist in this case, and I think the impoundment was unconstitutional and the heroin seized in the vehicle's ashtray should have been excluded.

Turning now to part IV, and the appropriateness of the personal search which officer Ivey Yancy did on Ponce at the filling station which resulted in the discovery of a dose of heroin in Ponce's watch pocket, I commend and concur with the writing of the panel opinion beginning on page ____, which demonstrates so exquisitely why the Supreme Court's decision in Minnesota v. Dickerson prevents an endorsement of the government's view that Yancy's removal of the contents of Ponce's watch pocket was permissible as part of a protective search for weapons under Terry v. Ohio. In my view, Minnesota v. Dickerson should have controlled the disposition of this entire issue because officer Yancy was clearly outside of the bounds of a Terry stop when he put his finger in Ponce's watch pocket to extract something which sounded like paper rattling and which he thought was folded-up money. The suppression hearing in Ponce's case took place about a year before

**26**

the decision of the Supreme Court in <u>Minnesota v. Dickerson</u>; and had that Supreme Court opinion been available, I doubt seriously that the trial judge would have ruled as he did. The government attempts to avoid the impact of <u>Dickerson</u> by contending that there was some special consent given by Ponce to the search of his person and that the discovery of the heroin in his watch pocket was within the scope of that consented search. Appended as Exhibit "A" to this dissent is an extract showing all of the questions propounded by both the prosecutor and defense counsel to officer Yancy at the suppression hearing which deals with the subject of consent to search or scope of search. In my view, a detailed review of these questions and answers from the written transcript (disregarding contrary testimony offered by Ponce on the credibility choice available to the trial judge) shows conclusively that: (i) Officer Yancy never really requested permission from Ponce to conduct a body search, but simply told Ponce that he "was going to pat him down"; and (ii) even if some sort of request for consent was made, the request related only to a search for "weapons." A request to search for weapons, even if consented to, should not be construed as including the right to examine the contents of a watch pocket, particularly not when the officer had already fingered the contents of that watch pocket from the outside and testified that he thought it made a noise like rattling paper and could have been more folded-up money. It is patently clear that officer Yancy never asked, "Can I search for you for drugs?" Until that question gets asked, I would hold that a police officer is limited in the scope

**27**

of his search to that which was spoken about, i.e., "weapons" in this case.

With all due respect to the honorable trial judge in this case, I conclude that his rulings on both points in this suppression hearing were clearly erroneous; and the conviction should be REVERSED.

**No. 92-8356; <u>USA v. Ponce</u>**

This extract includes all questions regarding consent to search and scope of search propounded by both the prosecutor (Mark Marshall) and defense counsel (Ben Florey) to the witness (officer Ivey Yancy) at the suppression hearing held in Austin, Texas, on April 17, 1992, at the U.S. Courthouse, regarding events which occurred on November 10, 1990.

<u>**DIRECT EXAMINATION**</u>
by prosecutor
**Mark Marshall**

**(page 7, lines 9-25)**

Q    All right.  Did you talk with him about anything else?

A    Then I -- Officer Barber pulled up at that time.  He pulled up at that time, and he got out and he walked to the other side, and I began to -- when I began to talk with Officer Barber, he told me there was a possibility of weapons in the car.

Q    Did he indicate he knew Mr. Ponce?

A    Yes, sir.

Q    Did he tell you anything about weapons on Mr. Ponce?

A    As -- repeat the question.

Q    Did he relate anything to you concerning weapons about Mr. Ponce, that he might have a weapon?

A    Yes, sir.  There was a possibility that he might have some weapons on him.

Q    Was this based on Officer Barber's prior knowledge of this Defendant?

A    Yes, sir.

**(page 8, lines 1 - 13)**

Q    Did you get a little more suspicious at that point?

A    Yes, sir.

Q    What did you do after Officer Barber gave you that information; did you talk with Mr. Ponce?

A    Yes, sir, and I asked him if it was okay for us to search his car.

Q    How did he reply?

A    Sure.

Q    Did he ever deny --

A    No.

Q    I notice that you indicated there was a refusal of consent.

A    That was my misrepresenting of this officer's report.

**(page 8, lines 16-21)**

Q    (By Mr. Marshall) What happened after Mr. Ponce gave consent to search his vehicle?

*E X H I B I T "A"*

A    Officer Barber then began to search his vehicle.  At that time another officer called me on the radio and advised me that he had known Mr. Ponce and he had dealt with him with narcotics before.

**(page 9, lines 13-20)**

Q    All right.  Did there come a time when you searched the Defendant?

A    Yes, sir.  I searched him for weapons.

Q    All right.  Did you just search him on your own?

A    I asked him, and then I just frisked him down.

Q    How did he reply when you asked if you could search him?

A    Go ahead.

**(page 10, lines 3-12)**

Q    All right, sir.  Did there come a time when you searched him again?

A    Yes, sir.

Q    All right.  Why did you search him that time?

A    To check again for possible weapons.

Q    Did you search his entire body the first time?

A    I just patted him down the first time, just a qu[i]ck frisk.

Q    What were you searching for the second time?

A    Still possible weapons.

**(page 11, lines 15-17)**

Q    All right, sir.  At any time did the Defendant refuse to consent to either a search of his vehicle or his person?

A    Yes, sir.

### CROSS EXAMINATION
by defense counsel
**Ben Florey**

**(page 13, lines 21-25; page 14, lines 1,2)**

Q    All right.  So if he did consent, you would have to put that in the report, right?

A    Well, he said -- he didn't say no, so he said yes.

Q    I mean, if you asked him for consent and he did or did not consent, you would put both the request and the reply in your report.

A    Yes, sir.

**(page 19, lines 18-25; page 20, lines 1-4)**

Q    Did you ask him if he had any weapons?

A    Yes, sir.  That was after I was -- Officer Barber informed me that there were possible weapons.

Q    All right.  Did you pat him down before you searched his vehicle?

*E X H I B I T "A"*

A    Yes, sir.  I believe I did.  I believe I did.

Q    Why did you pat him down?

A    To make sure he didn't have any on his person.

Q    Have any what?

A    Weapons.

Q    You patted him down for weapons?

A    Yes, sir.

**(page 20, lines 10-24)**

Q    Did you ask him to put his arms out?

A    I said, "I just want to pat you down."

Q    He didn't have any problem with you patting him down?

A    Yes, sir.

Q    Or did you even ask him?

A    He was cooperative.

Q    He didn't say no?

A    No, sir.

Q    Did he say yes?

A    Yes, sir.

Q    He said, "Please pat me down?"

A    No.  When I asked him, I said, "I'm going to pat you down," and he said okay.

Q    You didn't ask him?

A    I told him, "Well, I'm going to pat you down."

**(page 21, lines 14-17)**
Q    Did you pat down his jacket?

A    I had him take it off and give it to me.

Q    That was during the initial pat-down?

A    Would be part of it, concurrent with it.

**(page 22, lines 20-22)**
Q    You say you patted him down for weapons in your offense report?

A    Yes, sir.

**(page 23, lines 24,25; page 24, lines 1,2)**
Q    All right.  Now, your offense report then goes into after you patted him down, you found no weapons, is that right?

*EXHIBIT "A"*

A    Right.

**(page 25, lines 24,25; page 26 line 1)**
Q    Did you then ask him for permission to look in his jacket?

A    As for weapons.

**(page 26, lines 20-23)**
Q    Yes, sir.  And then you asked him if it was okay to search his jacket?

A    If it was okay if I patted him down again for my safety.

**(page 28, lines 15-25; page 29, lines 1-8))**
Q    (By Mr. Florey)
     When you patted him down the second time, you said you were patting him
     down for weapons, is that right?

A    Yes, sir.

Q    And you know you don't have to ask consent to pat down for weapons if you
     are in a situation where you felt like your safety is concerned?

A    That's right.

Q    He had already given you permission to pat down the jacket?

A    Yes, sir.

Q    You proceeded to pat down his person or the pants the second time looking
     for weapons?

A    Yes, sir.

Q    You didn't ask for consent to search for weapons did you?

A    I asked him could I pat him down again.

Q    Well, he didn't resist is what you're saying?

A    No, no resistance.

**(page 32, lines 20-25; page 33, lines 1-5)**
Q    (By Mr. Florey)
     When you asked him for his jacket, or did you say, "I'm going to search
     your jacket," which way?

A    As in?

Q    As in --

A    Give me your jacket, I'm going to search it?

Q    Yeah, give me your jacket, you're going to search.

A    It would be more along the lines, "Is there any weapons on your jacket or
     in your jacket?  Could I touch your jacket?"

Q    And he handed it to you?

A    Yes, sir.  There wasn't no problem.


*E X H I B I T "A"*

## <u>REDIRECT EXAMINATION</u>
by prosecutor
Mark Marshall

**(page 33, lines 24,25; page 34, lines 1-3)**

Q     Did the Defendant make any statement?

A     He -- he made one statement, but I didn't put it in the report sir.

Q     What did he say?

A     He said, "Dang, I forgot it was in there."

*E X H I B I T "A"*