# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 15, 2010

No. 09-40070

Charles R. Fulbruge III
Clerk

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

DANIEL LONGORIA

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. C-08-321

Before KING, BARKSDALE, and ELROD, Circuit Judges.

PER CURIAM:[*]

Convicted for possession of a firearm by a convicted felon, Daniel Longoria contests the denial of his suppression motion. At issue is only the voluntariness of his consenting to his home being searched, which led to the firearms' discovery. AFFIRMED.

I.

The following facts were developed at the evidentiary hearing for Longoria's suppression motion. In May 2008, Texas Department of Public Safety

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-40070

Sergeants Rickel and Pauska set up surveillance outside a duplex in Corpus Christi, Texas, looking for Adam Anderson, a fugitive, to execute on him a felony arrest warrant for drug-related offenses. In addition, there was a pending motion to revoke his probation. The Sergeants believed Anderson resided in the upstairs apartment of that duplex. The Sergeants were also aware that Longoria, whom the Sergeants believed to be acquainted with Anderson, resided in the downstairs apartment and was a convicted felon (on parole) for possession of a controlled substance.

During their surveillance, the Sergeants observed a white male wearing a baseball cap and driving a black pickup truck depart from the rear of the duplex. Sergeant Rickel testified that the driver resembled Anderson, *whom the Sergeant had met the previous year*. The Sergeants, in separate, unmarked vehicles, decided to follow the truck. After they began doing so, the truck's driver accelerated and began driving recklessly, causing the Sergeants to believe the driver was Anderson and was attempting to evade them. The Sergeants eventually lost contact with the truck. Sergeant Rickel then decided to return to the duplex.

When he arrived there, Sergeant Rickel observed the same truck parked in the driveway. A neighbor informed him that two people had run from the truck into the downstairs apartment. Sergeant Rickel notified Sergeant Pauska that the truck had returned to the duplex and also radioed for additional Officers. Once Sergeant Pauska and other Officers arrived, all of the Officers positioned themselves at the front and back doors of the downstairs apartment. They knocked on both doors, identified themselves as state police, and ordered that the door be opened. In addition, Sergeant Pauska shouted, "*Adam*, open the door. We know you're inside. Open the door or we're going to come in and get you". (Emphasis added.)

2

Longoria, whose first name is Daniel, *not* Adam, opened the back door of the apartment, which led into a small kitchen area. The Officers observed both Longoria and Andrea Nicole Mitchell in the kitchen. At this point, out of caution, the Officers had drawn their weapons but were holding them to their side, *not* pointing them at Longoria or Mitchell. Sergeant Rickel then ordered them to lie down on the floor and asked where Adam (Anderson) was. Longoria acknowledged he knew Anderson, but stated he was not in the apartment. The Officers then asked Longoria whether anyone else was in the apartment. Longoria responded: "No, there's not. *You can look if you want*". (Emphasis added.)

As a result, the Officers entered and conducted a protective search to ensure no one else was there. Neither Longoria nor Mitchell had been handcuffed. During the search, Sergeant Pauska found a box labeled ammunition within a clear container inside the bedroom closet, but he did not then open the box. Next, Sergeant Rickel telephoned the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) for assistance. When ATF Agents arrived, the Officers and ATF Agents opened the above-referenced box and found ammunition. In plain sight inside the closet, the Officers also found a clear bag of methamphetamine.

The Officers then asked Longoria's permission to search for further contraband. This time, however, Longoria refused to give either oral or written consent. Sergeant Rickel then returned to his office to draft an affidavit in support of a search warrant, while the other Officers remained with Longoria and Mitchell in the apartment. Sergeant Rickel returned with a search warrant and gave Longoria a copy, and the Officers asked him if he had any other contraband. Longoria led the Officers to three firearms.

Longoria was charged with one count of being a felon in possession of three firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He filed a motion

to suppress evidence, claiming: his consent for the Officers to enter and search his apartment was involuntary; and, therefore, the search violated his Fourth Amendment rights. The court then held the above-referenced evidentiary hearing to determine whether the consent was voluntary.

In denying Longoria's suppression motion, the district court concluded that the Government met its burden of proof with respect to the reasonableness of the warrantless search. The court found, after considering the factors provided in *United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir. 1995), discussed *infra*, that Longoria voluntarily consented to the Officers' searching his residence without a warrant.

In finding his consent voluntary, the court found: when the Officers knocked on Longoria's door, they shouted, "Adam, open up"; and they did *not* direct their command to Daniel Longoria. (As noted, the Officers knew Longoria resided in the apartment.) Further, the court found that, once Longoria opened the door, the Officers made no attempt to enter the apartment, nor did they even request to do so. Instead, the court found that the Officers asked, "Where's Adam?". The court found, by implication, that this confirmed to Longoria that they were interested only in locating Anderson. Longoria then, without being asked, gave the Officers permission to enter the apartment to determine no one else was inside.

The court relied on its past experience with Longoria in determining that he possessed sufficient education and intelligence to know of his right to decline consent. The court also noted, as evidence of Longoria's awareness of his right to privacy and to refuse consent, the cameras Longoria had placed around his home to secure it from the presence of others. As further evidence of this awareness, the court noted that, after the Officers discovered the box of ammunition and the bag of methamphetamine, Longoria refused consent to any additional search of his apartment. The court acknowledged that the Officers'

No. 09-40070

ordering Longoria and Mitchell to lie on the floor appeared somewhat coercive but stated that these actions were not so coercive as to force Longoria to give consent to search the apartment.

Following the denial of his suppression motion, Longoria waived his right to a jury trial and was convicted following a short bench trial on stipulated facts. He was sentenced to, *inter alia*, 112 months' imprisonment.

## II.

A warrantless search is presumptively unreasonable unless the search falls into an exception to the Fourth Amendment's warrant requirement. *United States v. Karo*, 468 U.S. 705, 717 (1984). Needless to say, one well-settled exception is a search conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). In challenging the denial of his suppression motion, Longoria maintains his consent was involuntarily given as a result of the Officers' coercive tactics. (In other words, he does not claim he was seized, in violation of the Fourth Amendment, inside his home. Nor does he claim the conduct of the Officers, including the ATF Agents, exceeded the scope of any consent that he might have given to locate Anderson.)

"When reviewing the district court's denial of a suppression motion, we review conclusions of law *de novo* and findings of fact for clear error; the evidence is viewed in the light most favorable to the prevailing party." *United States v. Gibbs*, 421 F.3d 352, 356–57 (5th Cir. 2005). "[T]he question whether consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances". *Jenkins*, 46 F.3d at 451 (quoting *Schneckloth*, 412 U.S. at 227) (alteration in original); *see also United States v. Ponce*, 8 F.3d 989, 997 (5th Cir. 1993) (citing *United States v. Gonzales*, 842 F.2d 748, 754 (5th Cir. 1988)) ("As the district court's resolution of the voluntariness issue is a finding of fact, it is reviewed only for clear error."). In that regard, if the

Government relies upon consent, it "has the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given". *Ponce*, 8 F.3d at 997 (citing *United States v. Hurtado*, 905 F.2d 74, 76 (5th Cir. 1990) (en banc)).

For determining whether, under the totality of the circumstances, consent was given voluntarily, our court has enumerated six relevant factors:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*Jenkins*, 46 F.3d at 451 (quoting *United States v. Olivier-Becerril*, 861 F.2d 424, 426 (5th Cir. 1988)). No one of these factors is dispositive. *Id.*

To hold the district court clearly erred in finding Longoria consented voluntarily to the initial search of his home, our court must "on the entire evidence [be] left with a firm and definite conviction that a mistake has been committed". *United States v. Gomez-Moreno*, 479 F.3d 350, 354 (5th Cir. 2007) (quoting *In re Missionary Baptist Found. of Am., Inc.*, 712 F.2d 206, 209 (5th Cir. 1983)). In other words, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently". *United States v. Charon*, 442 F.3d 881, 890–91 (5th Cir. 2006) (quoting *United States v. Harris*, 434 F.3d 767, 773 (5th Cir. 2005).

### A.

To support his claim that the district court erred in making its findings regarding consent, Longoria relies primarily on *United States v. Morales*, 171 F.3d 978 (5th Cir. 1999), in which our court held defendants did not voluntarily

No. 09-40070

consent to officers' entry and search. Longoria's reliance on *Morales*, however, is misplaced.

In *Morales*, Fort Worth police officers received an anonymous "911" call, reporting that two Hispanic males were unloading cocaine from flatbed trucks at Milagro's Botanica. *Id.* at 980. Four officers arrived at the scene, but they did not see any flatbed trucks or Hispanic males in the area. *Id.* After checking the registration of a pickup truck parked in front of Milagro's and, finding the vehicle was registered to a man with a Hispanic surname, the officers proceeded to investigate the warehouse behind Milagro's, from which they heard loud banging noises. *Id.*

Upon seeing two individuals opening crates inside the warehouse, the officers began banging on the front door, and shouted, "Fort Worth Police: Open the door". *Id.* The *Morales* court stated that "[t]he loud banging on the door, the tone of voice, its volume, and the authoritative manner unmistakably showed that the officers issued an order as opposed to a request to open the door". *Id.* When one of the individuals inside the warehouse opened the door, the officers "immediately rushed in with their weapons drawn and arrested the [individuals]". *Id.* at 981. *Morales* held that the individuals inside the warehouse did not give voluntary consent for the officers to enter. *Id.* at 983.

Unlike the facts of *Morales*, the Officers standing outside Longoria's apartment did not make a categorical demand to whomever was inside to open the door. Instead, the Officers shouted, "Adam, open the door". In addition, they did not rush inside immediately after the door was opened. When Longoria opened the door, in contrast to *Morales*, the Officers remained outside the apartment until Longoria gave them permission to enter. Based on these facts, the Officers' actions here do not closely resemble those in *Morales*.

7

No. 09-40070

### B.

An examination of the six *Jenkins* factors for determining voluntariness confirms that, under the totality of the circumstances, the district court did not clearly err in finding Longoria's consent voluntary.

### 1.

The first factor, the voluntariness of Longoria's custodial status, cuts the most strongly against finding voluntariness. Once the door was opened, Longoria and Mitchell immediately were ordered onto the floor by Officers with their weapons drawn. Further, the Officers had completely surrounded the duplex and had even parked police vehicles on the front lawn of the duplex. These actions do not indicate that Longoria's custodial status was voluntary. As previously stated, however, no one factor is determinative.

### 2.

The second *Jenkins* factor, the presence of coercive police procedures, also weighs against voluntariness. When the Officers ordered Longoria and Mitchell on the floor, they did so while their weapons were drawn—but *not* pointed at Longoria or Mitchell— after completely surrounding the duplex. As noted, the district court stated that these actions seemed unnecessarily coercive.

On the other hand, it is quite understandable why the Officers would have been extremely cautious. Indeed, when an officer is questioning an individual at the side of a vehicle, the individual will often be asked to place his hands on the hood of the vehicle to ensure the officer's safety. Our court has previously held that such precautions do *not* violate an individual's Fourth Amendment rights when an officer has a "reasonable, articulable suspicion that criminal activity is afoot". *United States v. Jordan*, 232 F.3d 447, 448 (5th Cir. 2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Moreover, our court has also stated that even handcuffing an individual does not automatically convert an investigatory detention into an arrest requiring probable cause. *Id.* at 450

No. 09-40070

(citing *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993)). Here, neither Longoria nor Mitchell had been handcuffed.

3.

The third factor is the extent and level of Longoria's cooperation with the police. When the Officers began knocking on the door, they shouted, "Adam, open the door". As stated *supra*, this was not a categorical order that *whomever* was inside must open the door. Rather this statement was targeted directly at Anderson, whom the Officers believed to be inside. Yet, Longoria chose to cooperate with the Officers and opened the door. Longoria also immediately complied with the Officers' instructions by lying on the floor. Further, as the district court noted, by allowing the Officers to come inside his home to search for Adam Anderson *before* they asked to do so, Longoria was fully cooperating with the Officers. His cooperation with them, especially his offering to let them search the apartment, strongly suggests Longoria was acting voluntarily.

4.

The fourth factor, Longoria's awareness of his right to refuse consent, weighs heavily in favor of finding voluntariness. Indeed, Longoria clearly demonstrated his knowledge of this right by later refusing, as discussed above, to allow the Officers to search his apartment further after they discovered the box of ammunition. Moreover, the district court explained that, based on Longoria's prior appearances before that court, Longoria was familiar with the criminal system and understood his right to refuse consent.

5.

The fifth factor concerns Longoria's education and intelligence. The district court found, based on its prior above-described experience with Longoria, that he possessed sufficient education and intelligence to understand his right to refuse consent. Nothing in the record disputes Longoria's education and intelligence were sufficient to understand this right.

9

6.

The last factor, Longoria's belief that no incriminating evidence would be found, also weighs in favor of voluntariness. Longoria's weapons were not discovered in the middle of his apartment. Nor were they even found during the initial protective search. The box of ammunition found in the closet was inside a clear plastic container. The Officers only discovered the box because it was visible through that container. It is certainly possible that Longoria was unaware the box of ammunition was in plain view. From the evidence in the record, Longoria could have easily believed no incriminating evidence would be found when the Officers searched the apartment for Anderson.

In sum, after considering the *Jenkins* factors, including reviewing the evidence in the light most favorable to the Government, and based on the totality of the circumstances, we are *not* left with a "firm and definite conviction that a mistake has been committed". *See Gomez-Moreno*, 479 F.3d at 354. Therefore, the district court did not clearly err in finding Longoria's consent was voluntary.

III.

For the foregoing reasons, the judgment is AFFIRMED.