[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 983 
The appellant, Derrick Oneal Mason, was convicted of the capital offense of murder committed during the course of a robbery in the first degree or an attempt thereof, a violation of § 13A-5-40(a)(2), Code of Alabama 1975. By a vote of 10 to 2, the jury recommended that the appellant be sentenced to death. The trial court followed the jury's recommendation and sentenced the appellant to death.
At the time of her death, 25-year-old Angela Cagle was working as a clerk in a Majik Mart convenience store in Huntsville. Around 2:30 a.m. on Sunday, March 27, 1994, Don Teal, a newspaper delivery man, entered the south door of the Majik Mart to deliver a stack of newspapers. He spoke briefly with Angela Cagle and a customer who was in the store.
Around 3:30 a.m., DeAnna Lechman stopped by a nearby Circle K convenience store to purchase some cigarettes. Circle K did not have the brand that Lechman wanted, so she went to the Majik Mart. Lechman entered through the north door of the store because the south door was locked. As she entered the store, she noticed a sign on the door that read, "This door locked. Use other door." (R. 825.) Lechman did not see anyone in the store, so she assumed that the clerk was in the back. She called out for the clerk. When Lechman approached the back of the store, she observed the partially nude body of Angela Cagle, lying in the storeroom.
Lechman went to the counter and telephoned for help. While she was talking *Page 984 
with the police dispatcher, she noticed that the "gas pump machine" was beeping and that it reflected an amount of $5.00 in the display. The cash register was also emitting a continuous tone. In order to hear the dispatcher, Lechman turned off the gas pump machine. She tried unsuccessfully to turn off the cash register.
Within a few minutes, the police arrived at the scene. Paul Hatfield, a patrol officer with the Huntsville Police Department, was one of the first officers to arrive. When Hatfield entered the storeroom, he found the partially nude body of Angela Cagle — she was wearing only her socks — lying across a desk. Cagle was lying on her left side, and she appeared to have suffered a gunshot wound to the right side of her face. Cagle had no visible signs of life.
Cagle's clothing was found near the desk. A bullet was recovered from the west wall in the area above Cagle's hips. A second bullet was found on some shelves located directly north of the victim's head. A shell casing was discovered in the book-shelves, and another casing was found on the floor in the area near Cagle's body. When the coroner removed Cagle's body, a second bullet wound was found on the victim's left cheek. Black buttons were found in the area near Cagle's body. Another button was later found stuck to the victim's chest. A negroid pubic hair, consistent with a known pubic hair from the appellant, was found in the combings from Cagle's pubic hair. In addition, cloth fibers that did not match Cagle's clothing were found on her left inner thigh and calf.
Susan Marcum, who was at that time the manager of the Majik Mart, had spoken with Angela Cagle several times by telephone that night, the last time being around 2:00 a.m. Marcum was summoned to the store around 4:00 a.m. She was able to determine that the last sale occurred at 2:58 a.m., and that no money was missing from the store and that no gasoline had been stolen. Marcum testified that the only way to make the cash register emit the tone heard at the scene was to hit an incorrect button on the register.
Harry Renfroe, Jr., a homicide investigator with the Huntsville Police Department, assisted in the investigation. On March 28, 1994, he was contacted by Dewey Miller, the police officer who was securing the crime scene. Miller informed Renfroe that a black male had approached him at the scene and had asked what type of gun was involved in the incident. Miller told the individual that he did not know. The individual told Miller where he could be reached. Miller conveyed this information to Renfroe. When Renfroe telephoned the individual, the man asked Renfroe what type of weapon was used in the incident. Renfroe asked the individual what type of weapon he was interested in and the man replied a ".380." (R. 1154.) The individual declined to meet with Renfroe that day. When the man telephoned Renfroe the next day, Renfroe asked him what type of .380 had been used in the shooting. The individual indicated that he was not sure. At that time, Renfroe was aware that forensic tests performed on the bullets recovered from the scene indicated that the weapon used was most likely a Davis .380. The man subsequently telephoned Renfroe and told him that the weapon was a Davis .380.
Renfroe agreed to meet with the individual at a local fast-food restaurant that afternoon. During their meeting, the man gave Renfroe the appellant's name. When Renfroe asked the individual why he thought the appellant was involved, the individual replied that the appellant had a .380 pistol and that the appellant was trying to make a name for himself. He told Renfroe that the appellant "was out of control." (R. 1157.) Renfroe returned to his office and informed the other investigators of the information that he had received. The investigators were able to obtain a physical description of the appellant, his address, and a description of his *Page 985 
vehicle.[1] Renfroe subsequently spoke with the individual who had furnished him the appellant's name, and the man said that the appellant would most likely be at a certain apartment complex that afternoon or later that evening. A "be-on-the-lookout" was issued for the appellant.
That night, James Goings, a member of the Huntsville Police Department special response team, and another officer spotted the appellant's vehicle. Goings stopped the appellant's vehicle after it entered the drive-through lane of a fast-food restaurant. Two officers in another vehicle followed Goings's vehicle into the parking lot. The appellant cooperated with the officers when he was ordered out of the vehicle and placed under arrest. The appellant was subsequently transported to the criminal investigation division of the police department (CID).
Lisa Hamilton, an evidence technician with the Huntsville Police Department, assisted by Officer Dwight Hasty, performed an inventory search of the appellant's vehicle. A Davis .380 pistol, which was wrapped in a shirt, and a clip containing five rounds of ammunition were found in the appellant's vehicle.
That night, Hamilton transported the weapon and the clip to Brent Wheeler, a firearms expert with the Alabama Department of Forensic Sciences. Ballistics tests indicated that the bullets found at the crime scene had been fired through the weapon recovered from the appellant's vehicle.
Harry Renfroe, one of the investigators, first spoke with the appellant when the appellant was brought into the interview room at CID on the night of March 29, 1994. After being apprised of his rights, the appellant waived his rights and talked with Renfroe. In response to Renfroe's questions, the appellant admitted that he had a Davis .380 weapon in his truck. He told Renfroe that he had borrowed the weapon the previous Thursday from an individual named "Barrington." The appellant told Renfroe that the gun had not been out of his possession since that time, and that it had been fired twice. When Renfroe inquired about the appellant's whereabouts on the night of the murder, the appellant told him that he had fallen asleep on the couch at his girlfriend's apartment, while watching television. During the course of the interview, Renfroe was informed that ballistics tests indicated that the gun found in the appellant's truck was the murder weapon. When Renfroe confronted the appellant with this fact, the appellant continued to deny any involvement in the murder. Renfroe left the interview room.
The appellant subsequently asked everyone but James (Bud) Parker, an investigator with the Huntsville Police Department, to leave the room, and then he confessed to Parker that he killed Angela Cagle. Parker testified as follows regarding the statement:
 "I identified myself, and at 016 hours on 3/30/94 I advised him of his rights. He said he understood and would tell me what happened.
 "I first asked him if his name was Derrick Oneal Mason, date of birth 8/9/74. He said, `Yes, sir.' I asked him if he shot the victim. He said, `Yes sir.' I asked him why he went into the store. And he said, `To rob it.' I asked him why he shot the victim. He said, `I just did it. It just happened.' I asked him what time he went into the store. He said, `It was late.'
 "During the course of the interview the suspect stated he went in the door on the side near the Circle K, which would have been the south door. The victim was from behind — from behind the counter working on a shelf with the merchandise. He had the gun out and *Page 986 
was trying to cover his face with his arm. He told her to lock the door, which she did. And she took the key over to the other door and left it in the key hole. He told her to unlock the cash register and to give him the money. She said she could not until the next transaction. He told her to go to the back and to unplug the camera. She went to the back and he went behind her. He kept telling her to unplug the camera, and she said there was no camera in the store. He then said, `I did not want to go back out front with the camera on.' He said, `She kept saying there was no camera in the store.' He did not believe her because he thought all stores had cameras. He told her, `If you don't unplug the camera, I will be forced to shoot you,' he said. `I had put a bullet in the chamber earlier and was just going to shoot.' He said, `I had the safety on.' I asked him if the clip was in the gun, and he said, `Yes.' I asked him if it was loaded, and he said, `Yes.' He then said, `I thought I was going to get carjacked earlier.' He then said, `I kept telling her to unplug the camera, and she kept saying they did not have a camera, and I did not believe her.' She said, `Let me go get you the money,' and I thought she was going to push some button. The victim started walking and he grabbed her by the shoulder and her jacket and shirt ripped. He heard the buttons fly off.
 "He then said, `I saw her private area.' He said, `She was crying and I got real nervous.' He then told her, `If you don't unplug the camera, I will make you take all your clothes off.' He looked outside to see if any car had stopped for gas. He told her to take all her clothes off, which she did. He told her, `Now unplug the camera and show me how to open the cash register.'
 "He then said, `I was high.' I asked him what he was on. He said, `Marijuana.' He then said he heard what he thought was a car. He said, `She was sort of standing in the floor in front of the desk and she came at me.' He again said, `I was high and the gun went off and I shot her.' He said, `It scared me. . . .' He then said, `I looked and saw her leg move and I did not want her to identify me.' He said, `I turned my head and put the gun down there and shot her the second time.'
 "I asked him how far away he was when he shot her, and he said, `About from me to you,' which was three to four feet. I asked him if he aimed the gun for her face, and he said, `I just saw her shoulder. I thought I shot her in the chest.' I asked him why he shot her the second time, and he said, `I did not want her to identify me; I just did it.'
 "I then asked him where he went after the shooting. He said, `I went up the street to the Executive Lodge and parked for about 10 minutes and tried to think, to cope with what I had done.' I asked him what he took out of the store, and he said, `Nothing.' I asked him which door he went out as he was leaving the store. He said, `The other door,' which would have been the north door. I then asked him if he raped the victim, and he said, `No.' I asked him if he touched her in any way with his hands. He said, `Nothing sexually.' I asked him where he went when he left the Executive Lodge Apartments, and he said, `I went home and then went to my girlfriend's.'
 "I asked him if his girlfriend knew what happened, and he said, `No.' I asked him if anyone knew, and he said, `I tried to tell my brother to get it off my chest, but I did not.' I asked him who owned the gun, and he said, `Barrington.' I asked him if anyone else was with him, and he said, `No.' I asked him how long he stayed in the store, and he said, `About 10 minutes.'
 "I then asked him why he did that. He said, `I was robbing the store to get the money to open a barber shop.' I then asked him how he was dressed that night. He said, `The jeans and shoes *Page 987 
that I have on and a purple shirt, which is at my girlfriend's house.' I then asked him if he knew the victim. He said, `I have never seen her before.' I then asked him if she was sitting up on the desk when the first shot was fired, and he said, `Her feet — her feet [were] on the floor,' and he thought she was going to come at him. He said he shot and thought he hit her in the chest. He then said, `Fuck, if she lives, that will be a witness. I held the gun over her and pulled the trigger, turning my head.'
 "I asked him what he was driving that night, and he said his mother's blue Oldsmobile and had it parked at Warren House Apartments and had walked to the store. I then asked him if he pumped some gas in his car before he shot the victim, and he then said, `I did get $2 in gas about 30 minutes before it happened.' I asked him if he got it at that store, and he said, `Yes. I just rode around.' I then told him to tell me the truth and asked if he pumped $5 in gas from the north pump, and he said, `No.'
 "I then asked him how he knew the victim was by herself. He said, `I parked at Warren House behind the Circle K, I walked down the hill behind the store, I looked inside from up on the hill, I then went back and got my car and pulled out on Sparkman and turned into the parking lot on the north side of the building.' I again asked if he parked at the gas pumps, and he said, `No, I parked at the door which was locked.' I asked him if he had anything else he wanted to tell me, and he said, `No, I can't think of anything else.'
". . . .
 ". . . I then told him there was one other thing I needed to know, and I asked him if he tried to open the cash register. And he said, `Yes, I pushed some buttons and it started beeping and I went out the door.'"
(R. 1250-56.)
Barrington Loyd Dames, a student at Oakwood College at the time of the murder, testified that he was an acquaintance of the appellant's. Dames loaned the Davis .380 pistol to the appellant on two occasions. He first loaned the appellant the gun approximately a week and a half before the murder. The appellant returned the gun to Dames two days later. Dames again loaned the appellant the pistol on the Thursday before Angela Cagle was murdered. Dames saw the appellant approximately two days after Cagle was murdered. The appellant told Dames that he still had the gun. The appellant did not return the gun to Dames.
Dr. Joseph Embry, a forensic pathologist for the Alabama Department of Forensic Sciences, performed the autopsy on Angela Cagle. He testified that the victim had several bruises on her body. Embry testified that the bruises to Cagle's left thigh, right knee, left arm, and buttocks appeared to be recent. Embry testified that Cagle had two bruises on her head, which appeared to have been inflicted by the same instrument. Dr. Embry testified that the victim had suffered two gunshot wounds to her head. The gunshot wound to the right side of Cagle's head passed through her brain stem, killing her instantly.
 I.
The appellant contends that comments made by the prosecution during closing arguments at the guilt phase of the trial mandate reversal of his conviction. Specifically, he claims that portions of the prosecution's closing arguments "included improper vouching regarding the credibility of the State's witnesses, statements of facts not supported by the record, improper statements of personal opinions regarding the evidence, misstatements of the law, and misstatements of the role of the jury and the function of a prosecutor in a criminal trial." (Appellant's brief, p 13.)[2] *Page 988 
The appellant concedes that he did not object to any of the allegedly improper comments; however, because this is a case in which the death penalty has been imposed, this Court must review the comments for plain error.
 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
Rule 45A, Ala.R.App.P.
 "In considering what constitutes plain error in a capital case, we have adhered to the interpretation of the term `plain error' adopted by the Alabama Supreme Court, which follows the interpretation given that term by the federal courts. See Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 88 L.Ed.2d 276, 106 S.Ct. 269 (1985); Ex parte Womack, 435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986, 78 L.Ed.2d 367, 104 S.Ct. 436 (1983). See also Hooks v. State, 534 So.2d 329 (Ala.Cr.App. 1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 102 L. Ed. 2d 1005, 109 S.Ct. 883 (1989). Plain error is error that has or probably has adversely affected a substantial right of the appellant, Ala.R.App.P. 45A, or is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Womack. The failure to object at trial weighs against any claim of prejudice an appellant may make. Kuenzel v. State, 577 So.2d 474
(Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala. 1991)."
Bush v. State, 695 So.2d 70, 87 (Ala.Cr.App. 1995), aff'd, 695 So.2d 138
(Ala. 1997). See, also, Davis v. State, [Ms. CR-93-1364, March 21, 1997]718 So.2d 1148, 1154 n. 3 (Ala.Crim.App. 1997).
In evaluating the propriety of prosecutorial arguments, this Court has stated:
 "`"This court has concluded that the failure to object to improper prosecutorial arguments . . . should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful." Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir. 1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).'
 "Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
". . . .
 "As the United States Supreme Court stated in Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986):
 "`[I]t "is not enough that the prosecutors' remarks were undesirable or even universally condemned." The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).'
"(Citation omitted.)
 "We must evaluate the comment in the context of the entire proceedings.
 "`"Whatever is in evidence is considered subject to legitimate comment by counsel." Bankhead v. State, 585 So.2d 97 (Ala.Cr.App. 1989), aff'd, 585 So.2d 112
(Ala. 1991). See also Ward v. State, 440 So.2d 1227
(Ala.Cr.App. 1983). "The prosecutor has the right to present his impressions from the *Page 989 
evidence. He may argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way." . . . Donahoo v. State, 505 So.2d 1067, 1072 (Ala.Cr.App. 1986).'
 "Williams [v. State], 601 So.2d [1062,] at 1072-73 [(Ala.Cr.App. 1991)]. `"[C]ounsel in the trial of any lawsuit has the unbridled right (to be sure, duty) to argue the reasonable inferences from the evidence most favorable to his client."' Kuenzel, 577 So.2d at 492, quoting Ex parte Ainsworth, 501 So.2d 1269, 1270 (Ala. 1986). (Footnote omitted.) . . . `"Counsel for the state and defendant are allowed a rather wide latitude in drawing their deductions from the evidence."' Kuenzel, 577 So.2d at 493, quoting Arant v. State, 232 Ala. 275, 279, 167 So. 540, 543 (1936)."
Burton v. State, 651 So.2d 641, 651-52 (Ala.Cr.App. 1993), aff'd,651 So.2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973,131 L.Ed.2d 862 (1995).
 A.
The appellant contends that the assistant district attorney improperly argued facts not in evidence. Specifically, he maintains that the assistant district attorney's closing argument "included numerous references to her own personal opinions about the evidence." (Appellant's brief, p. 13.) In support of his contention, he refers us to several portions of the closing argument where the assistant district attorney prefaced her remarks with the phrase, "I believe," or some other similar expression. The appellant argues that "[a]rguments regarding the prosecutor's personal beliefs are always improper, because the `beliefs' are based on non-record information." (Appellant's brief, p. 13.) In a related argument, he maintains that the prosecutor inappropriately "argued to the jury that in her opinion [the appellant] tried to rape Ms. Cagle," a statement that he claims is not supported by any evidence. (Appellant's brief, p. 13.)
We have carefully reviewed the assistant district attorney's closing argument and find that, contrary to the appellant's assertion, the prosecutor did not improperly argue matters not in evidence. In each instance cited by the appellant, the prosecutor was legitimately commenting on the evidence and was drawing reasonable inferences from that evidence. Burton, supra. The fact that the prosecutor prefaced some comments with "I believe" or "I think," or some other similar expression, does not render the comments improper.
 "In Ex parte Rieber, 663 So.2d 999 (Ala. 1995), cert. denied, 516 U.S. 995, 116 S.Ct. 531 (1995), the Alabama Supreme Court stated:
 "`Furthermore, we view those comments that the prosecutor prefaced with "I think," "I believe," "I feel," "I am satisfied," and "I have no doubt," as expressing his reasonable impressions from the evidence . . . . We note, however, that even if these comments were to be viewed as expressions of the prosecutor's personal opinions and, thus, as "crossing the line" as permissible argument, they nonetheless, would not constitute reversible error.'
 "See also, Boyd v. State, 715 So.2d 825 (Ala.Cr.App. 1997]."
Roberts v. State, 735 So.2d 1244, (Ala.Cr.App. 1997).
We find no error in the portion of the prosecutor's argument where she stated that the appellant might have tried to rape the victim. The prosecutor argued:
 "Do I think he raped her? I don't know. But what I do think is that he at least tried. There is no other explanation for having this woman be so completely humiliated with all of her clothes off. There is no other explanation for the pubic hair consistent with hers in his [sic]. There is, to me, some indication that it occurred by virtue of the fact that here on her upper left leg was a bruise, that on this left leg were found some *Page 990 
fibers of clothing not consistent with his [sic]. I will always believe that as she sat there on that desk trying to protect her virtue, he tried to pry her legs apart, perhaps with his elbow, causing this bruise, rubbed up against her perhaps causing the fibers on her left leg, and that as he tried to make entry he left that pubic hair in hers."
(R. 1347-1348.) When the victim was found, she was wearing only her socks, she had a fresh bruise on her inner thigh, and a negroid pubic hair consistent with the appellant's was found in her pubic hair. In addition, material fibers not consistent with her clothing were found on her inner thigh. Testimony established that the fibers could have been deposited on the victim by someone rubbing against her. There was evidence that the victim's shirt had been forcibly removed from her body. Furthermore, the appellant admitted to the police that he forced the victim to remove the rest of her clothes. Accordingly, we conclude that the prosecution's argument is a legitimate inference from the evidence presented.
 B.
The appellant also argues that the assistant district attorney inappropriately "argued to the jury that they must take the information provided by the confidential informant `as a matter of law,' a comment that, he claims, "is a clear misstatement of the law, and was calculated to mislead the jury." (Appellant's brief, p. 14.)
During her closing argument, the assistant district attorney argued:
 "In his opening, [defense counsel] stated a number of things, the most glaring of which I believe to be incorrect, was that the confidential informant was told by the uniformed officer there at the scene what type of weapon was used. I think it's important that I cover that with you. I don't necessarily believe this, but studies show that some jurors — or most jurors make up their mind about a case, I think they said 82% of all jurors make up their minds after the opening statements, and they are not supposed to do that. And I hope that you have not done that. Because part of what was said by [defense counsel] was glaringly incorrect. And I hope that as he comes before you in his closing argument, he will admit that the statements he made about the confidential informant were in fact, and are in fact, incorrect.
 "Investigator Renfroe told you that Officer Miller did not tell this suspect [sic] what type of weapon they were looking for, that Officer Miller did not know the caliber of the weapon they were looking for. And Officer Miller would have testified, but by agreement we didn't bring him in and put him on the stand; we allowed him to testify as to what Officer Miller would say. There is no dispute about that. And I think [defense counsel] will acknowledge that — that Officer Miller did not know what type of weapon was used and he did not tell this informant.
 "Now, as a matter of law, information provided by a confidential informant is admissible, and, if proven to be reliable, which it was in this case, then the identity and certain other legal things must happen, but because you were allowed to receive that confidential informant's information, it was in fact admissible, and because it was admissible and because it had been discussed by the parties and with the Judge and the law had been reviewed, the identity of this informant did not — does not and will not ever have to be revealed.
 "Investigator Renfroe told you that when he was approached by this young man, he did so on the condition of anonymity, he wanted to remain confidential. Investigator Renfroe told you from the stand that to this day his identity remains confidential. It's known to the parties that need to know, but to the finders of the fact, you must simply *Page 991 take, because it has been held admissible, the information that the confidential informant provided, as a matter of law.
 "This confidential informant, who is obviously known to the defendant, perhaps even a close friend of this defendant, said that he came to Investigator Renfroe because this young man, Derrick Mason, was out of control and wanting to make a name for himself on the streets."
(R. 1340-42.) (Emphasis added to highlight the portion the appellant finds objectionable.)
The allegedly inappropriate comment cannot be viewed in isolation, but rather should be viewed in the context in which it occurred. From our review of the record, it appears that the prosecutor's comments were directed toward statements made by defense counsel in opening arguments — in an apparent attempt to discredit the informant — that implied that the informant had learned from a police officer at the crime scene what type of weapon was involved. In her closing argument, the prosecutor reminded the jury that Investigator Renfroe testified that neither he nor Officer Miller had told the informant what type of weapon was involved. The prosecutor then told the jury why Officer Miller was not called to testify. The comment the appellant finds objectionable occurred as the prosecutor was explaining to the jury why the confidential informant had not been called to testify at trial.
When the allegedly objectionable comment is viewed in the context of the entire closing argument, it is apparent that the prosecutor was not telling the jurors that as a matter of law they had to believe the truth of what the informant said; rather, the prosecutor was explaining to the jury that as a matter of law the state was not required to reveal the identity of the informant. While perhaps the prosecutor's argument could have been clearer, we do not think the comment "`so infected the trial with unfairness as to make the resulting conviction a denial of due process'" Burton, 651 So.2d at 651, quoting Donnelly v. DeChristoforo,416 U.S. 637, 94 S.Ct 1868, 40 L.Ed.2d 431 (1974), especially in light of the fact that the trial court thoroughly instructed the jury that the testimony regarding what the informant said was not offered to prove the truth of what the informant is alleged to have said, but rather, it was offered to explain the sequence of events that followed from the officer's conversation with the informant. (See Part V of this opinion for a more detailed discussion regarding the admissibility of the information conveyed by the informant.) Finally, we note that the jury was cautioned many times that statements made by the attorneys were not evidence. Accordingly, the prosecutor's comment does not rise to the level of plain error.
 C.
The appellant contends that the district attorney "made numerous impermissible comments to the jury." (Appellant's brief, p. 14.) Specifically, he maintains that the district attorney improperly stated to the jury that there are "limitations imposed on the State in criminal trials regarding the type of testimony that is admissible." He claims this comment "clearly invited the jury to speculate about non-record information." (Appellant's brief, p. 14.) He also alleges that the district attorney improperly argued that he represented the accused. In support of his contentions, he refers this court to the following portion of the district attorney's closing argument in rebuttal:
 "As I said earlier in this case, I'm not the State of Alabama . . . . The State of Alabama is everyone in this courtroom, everyone who is a citizen of this community, of this county, and of this state, we are the State of Alabama. I represent you in this trial, that's my job. That's Ms. Hall's job.
 "Mr. Ferguson and Ms. Ferguson represent the defendant. They were retained by he or his family to represent *Page 992 
him, and it's their job to come in here and give him the best representation that they can.
 "Now, the reason I bring this up is that because I represent the State of Alabama and this defendant is a part of or a citizen of this community, Ms. Hall and myself in some way also represent him. And because of that fact, the law says and the rules that have been developed over the years by our Supreme Court and our legislature, dictate . . . what we can and cannot do in a criminal trial. And I know — or I suspect — I don't know, but I suspect that at some point during your deliberations, one or more of you will say to another one, `Well, why didn't the State do this?' or `Why didn't the State, the State's Attorney, say this? Why didn't they ask that witness this particular question? Why didn't they elicit this particular response to that question? Why didn't they produce into evidence and give us to examine a particular piece of evidence?' Well, if that question arises or any of those questions arise, that is your answer. We are limited by the rules of evidence, the rules of this court, and the laws of the State of Alabama. Because we function or serve a dual function and part of that being we, in some way, represent the defendant. So we have to be sure, as best we can, that this defendant gets a fair and impartial trial. So if any of you, during your deliberations, happen — that question comes up, `Why didn't the State do this? Why didn't he say this? Why didn't she say that?' that may be the answer for your question. Please keep that in mind, we do have these rules. Ms. Hall and I have no quarrel with those rules. I have been doing this some twenty-odd years, and people before me a couple of hundred years, have been operating under these same rules. So we don't have any quarrel with them. They are good rules, they make our system work. But I wanted you to understand that the State, the prosecutor, is limited because of this dual role, this dual function and because of these rules that are made to make sure that a person charged with a crime gets a fair trial."
(R. 1399-1402.)
When the comments are examined in context, it is clear that the district attorney was explaining to the jury that while his function was to represent the State of Alabama, he also had an obligation to ensure that the appellant received a fair trial, and in fulfilling that obligation, he was bound by evidentiary rules. The district attorney was not inviting the jury to speculate about nonrecord evidence. On the contrary, the district attorney was cautioning the jury that it should not speculate about matters that were not in evidence. We find no plain error in the district attorney's remarks.
 D.
The appellant alleges that the district attorney improperly argued "that the police obtained fingerprints in `one out of 20 or 25 cases.'" He maintains that "[t]here was no testimony regarding these statistics, and to argue them to the jury was improper." (Appellant's brief, p. 14.)
During defense counsel's closing argument, counsel argued that the appellant's fingerprints were not found at the scene — a matter that the state stipulated to during the testimony of the trace evidence technician.
During rebuttal closing arguments, the district attorney argued:
 "All right. Let's talk just a minute about some of the other, what we call trace evidence, that was found at the scene. Lisa Hamilton is an experienced crime scene investigator. She collected all the evidence that she thought was relevant to this case. She checked for fingerprints. They lifted a number of what we call latent fingerprints, none of which turned out to be of any value. That means they couldn't be identified, or the ones that could were not identified *Page 993 
as belonging to this defendant. But the ones that could were not identified as belonging to anybody else, either. So we don't know.
 "I submit to you that as she said, fingerprints are the kind of things that we prosecutors love to have but we very seldom get, contrary to what you see in the movies and on T.V. It's just one of those things, that if we — maybe one out of 20 or 25 cases we will have a fingerprint that can be identified. You can imagine in a convenience store all the surfaces from which you would expect to get somebody's fingerprints, like the door handles, the cash register, the counter around the cash register, and that sort of thing. How many people touch those things in a day's time or a week's time or month's time, between when they are cleaned and the next time? And it's just — you know, I put my fingerprints on a piece of glass. You come along behind it, you put yours on top of it, and neither of ours are going to be susceptible to identification. And that's just a fact of life. It's one I wish we had better technology and I wish we had fingerprints in every case, but we don't. But we always look for them. We keep trying. And once in a while we are rewarded with some. And there are a lot of reasons you don't find fingerprints, but those are some of the common ones."
(R. 1430-1431.)
The prosecutor's argument was directed toward defense counsel's intimation that the state's evidence was insufficient because the appellant's fingerprints were not found at the scene. Counsel has the right to respond to arguments by opposing counsel. Chandler v. State,615 So.2d 100, 110 (Ala.Cr.App. 1992), cert. denied, 615 So.2d 111 (Ala. 1993) (Ingram, J., dissenting). Although the specific number of times that fingerprints are successfully recovered was not in evidence, we do not find that the prosecutor's comment regarding that statistical figure "`so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Burton, 651 So.2d at 651, quotingDonnelly, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431. Furthermore, as previously noted, the jury was cautioned numerous times that comments by counsel are not evidence. Accordingly, the prosecutor's comment does not rise to the level of plain error.
 E.
The appellant again suggests that a comment made by the district attorney during his rebuttal closing argument inappropriately "invited the jury to speculate on evidence not admitted in the trial." (Appellant's brief, p. 15.) Specifically, he argues that the district attorney committed reversible error when he told the jury that the trial court had sustained defense counsel's objection to the admission of fibers into evidence and then stated, "`so you don't have them.'" (Appellant's brief, p. 14-15.)
The district attorney argued, in pertinent part:
 "What about these hairs and everything that was collected at the scene? [Defense counsel] made some issue about why the Caucasian hairs were not compared to someone else. Well, I submit to you that in this case, very soon after this crime was committed, Huntsville Police Department had developed a suspect, and very shortly thereafter, within a couple of days, as I recall, he was arrested and made a statement that is contained in [Investigator] Bud Parker's report, which effectively eliminated anyone else as a suspect in this case. So the detectives who handled this case, I'm sure — and I haven't asked them this — didn't see the need to go on and search further for a suspect. We have got a guy who has confessed.
 "Besides that, as I recall, none of these hairs were compared to any known head hair, pubic hair, body hair, or otherwise, until sometime this year, *Page 994 
which is about a year after the crime was committed. So during that period of time we have had all of those hairs, fibers — the fibers, by the way, that were recovered from the body, we offered and defense objected, as they have a right to do, and the Judge ruled that they are not admissible and they are not in, so you don't have them. But if we had found any other trace evidence that had any bearing on this case, either pointing towards the defendant's guilt or his innocence, we would have brought them to you.
 "As a matter of fact, the law requires us to let the other side know everything that we have, and we did in this case."
(R. 1431-1433.) (Emphasis added to highlight the portion the appellant finds objectionable.)
"[T]he prosecution must avoid statements that suggest to the jury that there exists evidence of a defendant's guilt that was not placed before the jury . . . ." Roberts v. State, [Ms. CR-93-1766, May 23, 1997]735 So.2d 1244 (Ala.Cr.App. 1997). When the comment alleged to be inappropriate is examined in context, it is clear that the prosecution was not suggesting that there was other evidence of the appellant's guilt. On the contrary, the prosecutor informed the jury that there was no additional evidence. Furthermore, although the actual fibers were not admitted into evidence, the jury was aware of the existence of the fibers because of the testimony from the trace evidence technician. The technician testified that the fibers had been collected from the thigh and calf area of the victim's leg, and that the fibers were not consistent with the victim's clothing. Accordingly, the prosecutor's reference to the fact that the trial court sustained defense counsel's objection to the admission of the actual fibers does not rise to the level of plain error.
 F.
The appellant maintains that the district attorney improperly vouched for the credibility of a witness and that he commented on matters not in evidence. Specifically, he suggests that the prosecutor committed plain error when he argued to the jury that Investigator Bud Parker had taken numerous statements from defendants and that Parker had testified many times in trials that resulted in convictions. We disagree.
During defense counsel's closing argument, counsel suggested that the appellant's statement to police during the investigation was not credible. Counsel argued:
 "This statement and the inconsistencies these officers say, that — I hope, if you have listened and remember the testimony, look at all of these exhibits and testimony, you will say there is reasonable doubt that these officers didn't make this statement up completely. And it's real important, because if you look at it, it's signed by Officer Parker. And I guess the thing that bothers me most about that testimony, is that Officer Parker, Officer Renfroe testified we have got this thing called the waiver of rights form, the City of Huntsville has these, and they say we have them out in the file cabinet or some type of bin, but he says we don't use them. He doesn't testify why they have them if they don't use them, but he says we don't have to use them, we are not required to use them. And then he states `I don't ever use them.' He says — and I believe it was Renfroe — he says, `I have used them twice.' And Parker says he doesn't use them, he has never used them.
 "And they testify — Bud Parker says, `I have a tape recorder,' he says, `I have got it down there.' He said, `I didn't use it.' He says, `We have got video equipment.' He says, `Yeah, part of it was working, but part of it wasn't. The part I can bring to court and show you, no, that wasn't working.' And he says, `Well, my tape recorder — yeah, I have got a tape recorder,' he says, `but I didn't tape it, didn't want to.' And it's important, of course, that he doesn't say *Page 995 
that until the end of the statement. He says, `Well, oh, I asked Derrick these questions, too.' He didn't ask Derrick at the beginning of that, that's something he thought of at the end of that statement, `Well, let me put in here that I asked him these things.' Because he knew this thing — this case was coming to court, and he knew when he got in front of this jury he was going to have to explain to you why he didn't tape-record it, he didn't videotape it, he didn't get a waiver form. And most importantly, this statement, why he wrote it and he signed it and not Mr. Mason. That's also important. And this bothers me. He says, `I took all these notes.' The problem is, he didn't have any of those notes. He has got it typed up, that he did later. He doesn't bring those notes he says he took that day. `Too many documents, we throw those away.' `We have about 14 homicides a year,' I believe he testified to, `but we don't keep any sheets.' And I think there is a good reason for that."
(R. 1391-93.)
In the prosecutor's rebuttal closing argument, he argued, in relevant part:
 "Whether or not any of these officers use a form, a waiver of rights form, is another smoke screen. Absolutely no bearing on this case. If you believe Officer Parker, Detective Parker, one of the most experienced homicide investigators we have got, one who has investigated hundreds of homicide cases in his career, who has interviewed and taken statements from numerous defendants, who has testified any number of times in a court of law which led to convictions of defendants based on those statements, if you don't believe what he told you that the defendant told him, so be it. But whether or not he used a form called a waiver of rights form has absolutely nothing to do with the truth of his testimony."
(R. 1439-40.)
The prosecutor's statements were in response to the intimation by defense counsel that the police officers had fabricated the appellant's statement. Counsel is given wide latitude in responding to arguments made by opposing counsel. Chandler, 615 So.2d at 110. Moreover, Detective Parker testified that he had been a homicide detective since 1980, that he had worked on "hundreds" of homicide cases, and that he had testified "hundreds" of times in court. (R. 1227.) Accordingly, the prosecutor's comment on Detective Parker's vast experience was a legitimate inference from the record and does not constitute plain error.
 II.
The appellant alleges that comments made by the prosecution during the sentencing phase of the trial diminished the importance of the jury's role in sentencing, in violation of Caldwell v. Mississippi, 472 U.S. 320,105 S.Ct. 2633, 86 L.Ed. 2d 231 (1985). In support of his contention, the appellant cites comments by the prosecution in its rebuttal closing argument in which the prosecution told the jury that its sentencing verdict was an advisory verdict. The appellant concedes that the prosecution correctly stated the law, but he maintains that the prosecution's "repeated" emphasis that the jury's verdict was advisory diminished "the jury's sense of responsibility." (Appellant's brief, p. 17.) The appellant did not object to the allegedly inappropriate comments in a timely manner; thus, his assertion must be reviewed under the plain error doctrine. Rule 45A, Ala.R.App.P.
 "In Martin v. State, 548 So.2d 488 (Ala.Cr.App. 1988), aff'd, 548 So.2d 496 (Ala. 1989), cert. denied, 493 U.S. 970 (1989), this Court reiterated the rule enunciated in Caldwell v. Mississippi, that the prosecutor could not mislead a jury to believe that, while it may impose a death sentence upon a defendant, the ultimate responsibility for determining the appropriateness of the death sentence lay *Page 996 
elsewhere. The Martin Court stated as follows:
 "`Under Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985), "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." However, the comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that its sentence verdict was "advisory" and a "recommendation" and that the trial court would make the final decision as to sentence does not violate Caldwell. "Comments which accurately explain the respective functions of the judge and jury are permissible under Caldwell `as long as the significance of [the jury's] recommendation is adequately stressed.`" Harich v. Wainwright, 813 F.2d 1082, 1101 (11th Cir. 1987). Here, neither the prosecutor nor the trial court misrepresented the effect of the jury's sentencing recommendation. The cases of Caldwell, supra; Mann v. Dugger, 817 F.2d 1471 (11th Cir.), vacated, 828 F.2d 1498 (1987); Adams v. Wainwright, 804 F.2d 1526
(11th Cir. 1986), modified, Adams v. Dugger, 816 F.2d 1493 (11th Cir. 1987); and Harich, supra, each involved a situation where the prosecutor and the trial court misled the jury as to its critical role in sentencing under state law. In Hooks v. State, 534 So.2d 329 (Ala.Cr.App. 1987), this Court reviewed the decisions of other jurisdictions which have confronted this issue and concluded: "The trial judge's and the prosecutor's remarks clearly defined the jury's role in the sentencing scheme. Thus, the jury could not have been confused as to its responsibility in the sentencing process. The remarks made here were a correct statement of the law and did not tend to mislead or misinform the jury. Therefore, we conclude the remarks were not improper under Caldwell, supra."'
"548 So.2d at 494."
Travis v. State, [Ms. CR-92-0958, April 18, 1997] ___ So.2d ___ (Ala.Cr.App. 1997). See also, Price v. State, [Ms. CR-92-0882, June 20, 1997] 725 So.2d 1003 (Ala.Crim.App. 1997); Ex parte Taylor, 666 So.2d 73
(Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856
(1996).
We have reviewed the prosecution's entire closing argument, including the allegedly inappropriate comments and the context in which they were made. From our review of the record, it appears that the prosecution's comments were made in response to comments by defense counsel during its closing argument, in which defense counsel suggested several times that the jury had the ultimate authority in determining whether the appellant lived or died. Counsel has the right to reply in kind. Taylor, 666 So.2d at 88. Furthermore, as the appellant concedes, the prosecution's comments are a correct statement of the law in Alabama. After reviewing the prosecution's argument in its entirety, as well as the context in which the allegedly inappropriate comments were made, we find that "there is `no reasonable possibility that the jury was misled, misinformed, or confused as to its critical role in sentencing under Alabama law.'"Price, quoting Taylor v. State, 666 So.2d 36, 51 (Ala.Cr.App. 1994). "The prosecutor's comments . . . `accurately informed the jury of its sentencing authority and in no way minimized the jury's role and responsibility in sentencing.'" Weaver v. State, 678 So.2d 260, 283
(Ala.Crim.App. 1995), rev'd on unrelated ground, 678 So.2d 284 (Ala. 1996). Accordingly, the prosecution's comments do not constitute plain error.
 III.
The appellant maintains that the trial court erred in denying his motion to *Page 997 
suppress the evidence discovered in his automobile because, he argues, the inventory search of the car was "not performed according to any standardized procedure." (Appellant's brief, p. 19.) Specifically, he contends that "[t]here was no testimony in this case regarding any standardized criteria established by the Huntsville Police Department for the inventory search of automobiles." (Appellant's brief, p. 19.)
Initially, we note that although the appellant filed three suppression motions, he did not argue this particular ground in any of those motions. While the appellant's attorneys did allude to this ground during their questioning of the police officers at the suppression hearing, counsel did not specifically move to suppress the evidence found in the appellant's car on this basis. At the conclusion of the hearing, one of the appellant's counsel indicated that she might later want to amend the appellant's suppression motions to add as a ground that the inventory search was not performed according to standardized procedure; however, the record contains no indication that the motions were amended to include this as a ground. Accordingly, we must review the appellant's allegation under the plain error doctrine. Rule 45A, Ala.R.App.P. While his failure to object does not preclude review, it does weigh heavily against him. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), aff'd,577 So.2d 531 (Ala. 1991).
 "In Ex parte Boyd, 542 So.2d 1276 (Ala.), cert. denied, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172
(1989), the Alabama Supreme Court explained the requirements of a valid inventory search of an impounded automobile and any containers located therein, whether conducted at the scene of the arrest or after it has been towed, as established by South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), and Colorado v. Bertine, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). In addition to proving the lawfulness of the arrest of the accused and the impoundment of the car, the state must establish that the inventory was accomplished through standard police procedures:
 "`[T]he record must sufficiently reflect what that policy is, describe the policy in such a way that its reasonableness can be reviewed, and present adequate evidence of what the employed criteria were.'
"542 So.2d at 1283 (emphasis original). . . .
 "'[A] police officer's conclusory testimony that the inventory was done in compliance with departmental regulations' is, by itself, insufficient to bring the search within the inventory exception. Boyd, 542 So.2d at 1282. Further, the absence of an inventory list and the fact that inventories are not uniformly conducted throughout the police department involved lend support to an inventory's not qualifying as a lawful search. Boyd, supra."
Sheffield v. State, 606 So.2d 183, 186-87 (Ala.Cr.App. 1992).
The pertinent evidence elicited at the suppression hearing established the following. Within a few days after the murder, the police received a tip that the appellant was the killer. The police subsequently discovered that the appellant had an outstanding warrant for assault in the third degree. A "be-on-the-lookout" was issued. On the evening of March 29, 1994, Officer James Goings and his partner spotted the appellant's vehicle and followed it into the parking lot of a fast-food restaurant. Officer Mark Plemons and his partner followed Goings's vehicle into the parking lot. Goings stopped the appellant's vehicle when it entered the drive-through lane of the restaurant. The appellant was asked to exit his vehicle, and he complied. He was placed under arrest by Officer Plemons, who had the outstanding arrest warrant.
Within a few minutes, Officer Dwight Hasty arrived at the scene. The appellant had already been arrested and placed in a *Page 998 
patrol car. Hasty and Investigator Lisa Hamilton performed an inventory search of the appellant's vehicle. Hamilton searched the vehicle, and Hasty recorded the items that Hamilton found on an inventory sheet. A gun that was subsequently determined to be the murder weapon and a clip containing ammunition were found between the front seats of the vehicle. The officers also found "three cassette tapes, a cassette player with headphones, a pager, Kodak 400 film, a bag of miscellaneous clothing and other paper items." (R. 149.)
Hasty testified that police policy authorized them to impound a vehicle if the seizure of the vehicle is incident to arrest or if the vehicle is a traffic hazard, or is obstructing "driveways." (R. 147.) Hasty testified that the appellant's vehicle was blocking the drive-through lane of the restaurant. He further testified that it was department policy to always perform an inventory search of the vehicle before the wrecker removed the vehicle from the scene. Hasty testified that the purpose of the inventory was to protect both the police and the owner of the vehicle from theft that might result while the vehicle was impounded. Hasty identified the impoundment sheet that he prepared at the scene. Compare Sheffield, 606 So.2d 183, 187 ("the absence of an inventory list and the fact that inventories are not uniformly conducted throughout the police department involved lend support to an inventory's not qualifying as a lawful search"). Officer Hasty indicated that he does not generally record such items as empty cans, or things of that nature, because, he suggested, they have no value.
In addition to Hasty's testimony regarding the inventory procedures, Officer Goings testified that police policy authorizes officers to impound a vehicle if it is a traffic hazard, or if the vehicle is on property belonging to someone other than the owner of the vehicle and is "blocking their business" (R. 116.), or if the vehicle is going to be used as evidence in a trial. He testified that police policy dictates that in order to impound the vehicle, the police must inventory "all the contents, [and] damage on it, as far as the windows, tires, body work, [and] paint." (R. 116.) Goings said that the results of the inventory are reported on an inventory sheet. He testified that, typically, the inventory is performed in the area where the vehicle is located; however, he indicated that if the vehicle is parked in a dangerous area, such as on a road, the police will move the vehicle to the side of the road before performing the inventory. Goings said that the appellant's vehicle had to be moved because it was blocking the drive-through lane of the fast-food restaurant. Goings thought that the "special operations division" had a copy of the police department's policy on impounding vehicles. (R. 118.)
The appellant does not dispute the legality of his arrest, and he does not argue that the officers lacked authority to impound his vehicle. Even, however, had he made such an argument, we would find that the arrest of the appellant and the impoundment of his vehicle were proper. The appellant's custodial arrest was pursuant to an outstanding warrant for assault in the third degree, the validity of which the appellant does not dispute. Furthermore, once the appellant was placed under custodial arrest, the officers acted reasonably in impounding the appellant's vehicle.
 "`Impoundment has . . . been justified on the grounds that it is necessary to protect the vehicle from damage and the police from liability.' Morton v. State, 452 So.2d 1361, 1366 (Ala.Cr.App. 1984), (overruled by Cannon v. State, 601 So.2d 1112, 1115 (Ala.Cr.App.) `to the extent that Morton holds that a driver must be given an election on whether to have his vehicle impounded or left where parked', cert. denied, 601 So.2d 1112 (Ala. 1992)). In United States v. Martin, 982 F.2d 1236, 1240 (8th Cir. 1993), the court found the impoundment of a legally parked vehicle proper where the owner left the scene for a `suspicious *Page 999 
length of time despite his promise to return, making it likely that no one would claim custody of the unlocked vehicle, which had valuable equipment inside in plain view.' The Eighth Circuit Court in Martin
stated that `[p]olice may take protective custody of a vehicle when they have arrested its occupants, see Colorado v. Bertine, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987), even if it is lawfully parked and poses no public safety hazard. See United States v. Staller, 616 F.2d 1284, 1289-90 (5th Cir.), cert. denied, 449 U.S. 869, 101 S.Ct. 207, 66 L.Ed.2d 89
(1980).' Martin, 982 F.2d at 1240. In United States v. Ponce, 8 F.3d 989, 996 (5th Cir. 1993), the Fifth Circuit Court of Appeals concluded that the `district court did not err in concluding that [the police officer] "acted appropriately and legally when he decided to impound and inventory [the appellant's] truck"' where the appellant's truck was properly parked in the parking lot of the parole office, because impounding the automobile `ensured that the truck was not left in a public parking lot where it could have become a nuisance, and where it could have been damaged or stolen.' Ponce, 8 F.3d at 996. Cf. Riley v. State, 583 So.2d 1353, 1355 (Ala.Cr.App.), cert. denied, 583 So.2d 1356 (Ala. 1991) (vehicle improperly impounded where `there is no indication in the record that the impoundment of the vehicle was necessary to protect the vehicle from damage or to protect the police from liability')."
Webster v. State, 662 So.2d 920, 922-23 (Ala.Cr.App. 1995). See alsoCannon v. State, 601 So.2d 1112 (Ala.Cr.App. 1992) (the fact that a vehicle was on private property did not preclude impoundment of the vehicle).
Contrary to the appellant's assertion, there was evidence regarding the police department's policy on inventory searches. While the testimony regarding the inventory procedures was not as detailed as it could have been, there was sufficient evidence produced to determine that there was a policy, what that policy was, the reasonableness of the policy, and that the officers acted in compliance with the established criteria when they conducted the inventory search — especially in light of the fact that the appellant did not raise this particular ground either before or during the suppression hearing, where it could have been thoroughly addressed. Accordingly, we find no plain error in the trial court's denial of the appellant's motion to suppress the evidence found in his vehicle.
Even if we were to conclude that the search was not authorized pursuant to an inventory search, the trial court's denial of the motion to suppress is due to be affirmed because the search of the appellant's vehicle was lawful as a search incident to an arrest. Sheffield, 606 So.2d at 187. This is so even though the appellant was already handcuffed and placed in the police officer's car when the appellant's car was searched. Gundrum v. State, 563 So.2d 27 (Ala.Crim.App. 1990).
 IV.
The appellant contends that the trial court erred in denying his motion to suppress his custodial statement because, he claims, "his arrest on the third-degree assault was merely a pretext for the police to interview him about the homicide of Ms. Cagle." (Appellant's brief, p. 20.) As we noted in Part III of this opinion, the appellant filed three suppression motions; this ground was not specifically raised in any of those motions. Furthermore, although the appellant hinted at this ground during the suppression hearing, he did not specifically move to suppress his confession on this basis. Accordingly, we must review his assertion pursuant to the plain error doctrine. Rule 45A, Ala.R.App.P.
The pertinent evidence presented at the suppression hearing established the following. The appellant was arrested pursuant to an outstanding arrest warrant against him for third-degree assault. Following the appellant's arrest, he was transported *Page 1000 
to the criminal investigation division (CID). En route to CID, the appellant asked what he was being arrested for and the officers told him he was being arrested for third-degree assault, and then an officer read him the arrest warrant. On the way to CID, there was no discussion regarding the murder of Angela Cagle.
At CID, the appellant was fingerprinted, photographed, and apprised of his rights. The appellant did not appear to be under the influence of alcohol or drugs. The appellant waived his rights and spoke with investigators about the assault charge. During the questioning regarding the assault charge, the investigators learned that a victim of a robbery and an assault that had occurred approximately two weeks earlier had identified the appellant as the assailant from a photographic line-up. The appellant was then informed that he was under arrest for robbery and attempted murder. He was again apprised of his rights. The appellant waived his rights and denied any knowledge of the robbery/attempted murder incident.
An investigating officer then questioned the appellant about the gun found in the appellant's vehicle. The appellant admitted that he had a gun in his vehicle, but he said that it did not belong to him. During the course of the questioning, the investigating officers were informed that the gun found in the appellant's vehicle was the murder weapon. When the appellant was confronted with this information, he denied any knowledge of the murder.
The appellant subsequently asked to speak with Investigator Bud Parker alone. Parker again advised the appellant of his rights. The appellant waived his rights and confessed to the murder of Angela Cagle.
 "`In Scarbrough [v. State, 621 So.2d 996 (Ala.Cr.App. 1992)], we adopted the "objective" test set forth by the Fifth Circuit Court of Appeals with regard to determining the validity of an alleged pretextual arrest:
 "`"`Again and again in precisely the present context, the [Supreme] Court has told us that where police officers are objectively doing what they are legally authorized to do — as in arresting [the defendant] pursuant to the valid warrant outstanding against him and interrogating him without coercion after reading him repeated Miranda warnings — the results of their investigations are not to be called in question on the basis of any subjective intent with which they acted . . . .
 "`"`. . . The relevant principle of the Supreme Court is likewise: so long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry. . . . The correct rule is that, while a showing of objectively reasonable good faith on the part of the police officers will ordinarily redeem honest errors and prevent the application of the exclusionary rule, in a case where the officers have taken no action except what the law objectively allows[,] their subjective motives in doing so are not even relevant to the suppression inquiry. And the reason lies in the purpose of that rule: to deter unlawful actions by police. Where nothing has been done that is objectively unlawful, the exclusionary rule has no application and the intent with which they acted is of no consequence.'"
"`". . . .
 "`United States v. Causey, 834 F.2d 1179, 1184-85 (5th Cir. 1987) (emphasis in original) (footnotes omitted)." Scarbrough, 621 So.2d at 1004."
Webster v. State, 662 So.2d 920, 921-22 (Ala.Cr.App. 1995), quotingFletcher v. State, 621 So.2d 1010, 1022-23 (Ala.Cr.App. 1993). See, also, Hutcherson v. State, 677 So.2d 1174 (Ala.Cr.App. 1994), rev'd on unrelated ground, 677 So.2d 1205 (Ala. 1996). *Page 1001 
In this case, the police arrested the appellant pursuant to an outstanding warrant for third-degree assault. The appellant does not challenge the validity of the arrest warrant. The evidence established that the appellant was advised of his rights three separate times, and that each time he knowingly and voluntarily waived his rights and spoke with the police. There was no evidence that the appellant was under the influence of drugs, or that his confession was coerced by inducements or threats. "As long as the police officer is doing only what is objectively authorized and legally permitted, the officer's subjective intent in doing it is irrelevant." Ex parte Scarbrough, 621 So.2d 1006,1010 (Ala. 1993). In this case, the officers' arrest and questioning of the appellant were objectively reasonable; accordingly, we find no plain error in the trial court's denial of the motion to suppress the appellant's custodial statement.
 V.
The appellant contends that the trial court's refusal to order the state to disclose the identity of the person who told Investigator Renfroe that the appellant had committed the murder constitutes reversible error. We disagree.
Before trial, the appellant filed several motions that, in essence, requested that the trial court order the state to reveal the identity of the person who had told the investigating officer that the appellant committed the offense. The appellant's motions were discussed several times during various pre-trial hearings and again at trial. The state objected to disclosing the person's identity, arguing that the person who had furnished the appellant's name to Investigator Renfroe was merely a "tipster," and was not a material witness. The state also objected on the basis that the disclosure of the tipster's identity could jeopardize that person's safety. The trial court agreed with the state and denied the appellant's motion.
The appellant intimates that the trial court's failure to order the state to reveal the identity of the informant violates the principle ofEx parte Monk, 557 So.2d 832 (Ala. 1989), which, he suggests, mandates an "open file" policy and thus entitles him to the "names and addresses of any persons with knowledge of any facts surrounding the death of Angela Michele Cagle." (Appellant's brief, p. 21.) While Monk does encourage liberal discovery in capital murder cases, it does not mandate that the state disclose to a defendant the name and address of every individual who has furnished information to the state in the investigation of a crime; rather, "Monk made it clear that whether to order discovery beyond that required by the constitution or by state law or rule is discretionary with the trial court." Council v. State, 682 So.2d 500, 501
(Ala. 1996) (Hooper, C.J., concurring specially in denial of certiorari review).
We find no abuse of discretion in the trial court's refusal to order the disclosure of the name of the individual who furnished the appellant's name to Investigator Renfroe.
 "Since Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), it is clear that the general rule of nondisclosure of witnesses is not always applicable to the government informant. In cases involving the `tipster' type of informant, who merely conveys information to the government but neither witnesses nor participates in the offense, courts generally hold that the disclosure of his identity is not material and, therefore, not required."
Self v. State, 420 So.2d 792, 795 (Ala.Cr.App. 1981), rev'd, 420 So.2d 798
(Ala. 1982) (emphasis added).[3] *Page 1002 
 "`Generally speaking, where the identity of a confidential informer is sought on the issue of guilt or innocence, and the alleged informer is shown to have been a participant in the transaction constituting the offense, the prosecution is required to disclose his identity and address on the request of the accused. The rule does not apply, however, to an informer who is involved in only an indirect way, such as a "tipster."'"
Lightfoot v. State, 531 So.2d 57, 58 (Ala.Cr.App. 1988) quoting 33 Am.Jur.P.O.F.2d 549 Criminal Law: Need for Disclosure of Identity ofInformant, at 559, 563 (1983) (emphasis added). See also, Garner v.State, 606 So.2d 177 (Ala.Cr.App. 1992); Colbert v. State, 615 So.2d 1213
(Ala.Cr.App. 1992), rev'd on an unrelated ground, 615 So.2d 1218 (Ala. 1992).
The record supports the state's contention that the individual who had provided the information in this case was merely a "tipster," and not a material witness to the crime. The "tipster" was not present at the crime, nor did the "tipster's" assertion that the appellant was the perpetrator provide the probable cause to arrest the appellant — the probable cause to arrest the appellant arose from an outstanding warrant for third-degree assault. See Harrell v. State, 555 So.2d 257, 261
(Ala.Cr.App. 1989) ("[t]he informant. . . was a mere `tipster' and was not a participant in the crime and did not provide probable cause for the arrest"). Moreover, the state demonstrated a compelling need to keep the individual's identity confidential.
The appellant did not prove at trial, nor does he demonstrate on appeal, how he was prejudiced by the failure of the trial court to order that the state disclose the identity of the individual. Accordingly, the trial court did not err in refusing to order the state to disclose the identity of the person who told the investigating officer that the appellant was the perpetrator.
The appellant also argues that the trial court erred to reversal in allowing Investigator Renfroe to testify to the substance of his conversation with the "tipster." He contends that Renfroe's testimony regarding what the individual had told him constitutes inadmissible hearsay. The appellant did not object to Renfroe's testimony; therefore, this Court must review this issue pursuant to the plain error doctrine. Rule 45A, Ala.R. App.P.
Investigator Renfroe's testimony did not constitute inadmissible hearsay because it was not offered to prove the truth of what the "tipster" told Renfroe; rather, it was offered to explain Renfroe's actions and the sequence of events following his conversation with the "tipster." See Sawyer v. State, 598 So.2d 1035, 1038 (Ala.Cr.App. 1992), cert. denied, 506 U.S. 943, 113 S.Ct. 386, 121 L.Ed.2d 295
(1992); and D.R.H. v. State, 615 So.2d 1327 (Ala.Cr.App. 1993). Moreover, following Investigator Renfroe's testimony, the trial court thoroughly cautioned the jury that Renfroe's testimony regarding statements made to him during the course of his investigation were not offered to prove the truth of those statements; rather, the testimony was offered as an explanation of the sequence of events and to explain Renfroe's actions. "[T]he trial judge's thorough limiting instruction was more than adequate to explain to the jury the purpose for which the evidence was received." Roper v. State, 695 So.2d 244, 246 (Ala.Cr.App. 1996), cert. denied, 695 So.2d 249 (Ala. 1997). Accordingly, we find no error in allowing Detective Renfroe to testify to the substance of his conversation with the "tipster."
 VI. and VII.
The appellant contends that the trial court improperly allowed the jury to consider as an aggravating circumstance that the offense was "especially heinous, atrocious or cruel compared to other capital offenses"[4] (Issue VI), and the trial *Page 1003 
court improperly found the existence of this aggravating circumstance (Issue VII). The gist of the appellant's argument is that the finding of this aggravating circumstance is based primarily on the assumption that the first bullet wound did not kill the victim, but caused the victim substantial pain — a finding that, he claims, is not supported by the record. In support of his contention, he argues that because the forensic pathologist who performed the autopsy on the victim could not conclusively determine which of the two bullet wounds occurred first, there was no evidence to support a finding that the first wound to the victim caused severe pain and suffering, but did not kill the victim. The appellant did not object to the submission of this aggravating circumstance to the jury, nor did he object to the trial court's finding of this aggravating circumstance; therefore, his assertions must be reviewed pursuant to the plain error doctrine. Rule 45A, Ala.R.App.P.
While it is true that the forensic pathologist was not able to conclusively determine which bullet wound occurred first, a reasonable inference from the record is that the painful, nonfatal injury occurred first. Dr. Embry testified that the bullet wound to the victim's left cheek was fairly superficial in that it would not cause loss of consciousness or death; however, he testified that such a wound would be extremely painful. Dr. Embry testified that the victim would still have been able to move her legs after the gunshot wound to the left cheek. According to Dr. Embry, the gunshot wound to the victim's right cheek was "instantly" fatal — the victim could not have moved her leg after suffering the bullet wound to the right cheek. The appellant confessed that he shot the victim a second time after he saw her move her leg. Furthermore, she was found lying on her left side; the bullet wound to her right cheek was clearly visible. Thus, one can reasonably infer from the evidence that the first bullet wound caused the victim great suffering, but that it did not kill her.
Moreover, the determination of the existence of the atrocious, or cruel compared to other capital offenses was not based solely on the fact that the first bullet wound caused the victim great suffering; rather, it was based on a combination of factors. The trial court found, in pertinent part:
 "The capital offense was especially heinous, atrocious or cruel compared to other capital offenses. The Court reaches this conclusion based upon the following evidence:
 "(a) The victim, Mrs. Cagle, was alone, defenseless and of no physical threat to the Defendant.
 "(b) The Defendant caused or directed the victim to disrobe in his presence, obviously inflicting great fear and humiliation in the victim prior to her death. There is no logical explanation for this behavior on the part of the Defendant except his indifference and even enjoyment of the suffering of this victim.
 "(c) The victim was shot twice at close range as indicated by the expert testimony. The first shot did not kill the victim but caused great pain as a result of the shattering of the bone or bones in her face. The second shot was fired into her face as she lay helpless and suffering from the first gunshot wound to the other side of her face.
 "(d) The Defendant planned this crime in advance, obtaining the gun used to kill the victim several days earlier and by parking his vehicle out of view and behind the store.
 "(e) The Defendant intended to kill the victim by shooting her the second time, realizing that she was still alive, so that there would be no witness to this crime.
 "(f) The most heinous, atrocious or cruel aspect of this crime was the execution-style killing of this victim. The court can conclude from the evidence *Page 1004 
presented, and from the confession of the Defendant, that he first made the victim go into the back storage room of the convenience store, which was not visible from the other parts of the store, or to anyone who might pass. He caused the victim to completely disrobe except for her socks, all of her clothing being found under or near the desk on which her body was found. He shot her at close range while she sat naked and completely vulnerable to the actions of the Defendant. Realizing that Mrs. Cagle was not dead because he saw her move, he inflicted the fatal gunshot wound at close range into the right side of her face. The Court concludes that the crime of this Defendant was extremely wicked, shockingly evil, outrageously wicked and vile and cruel, with the actions of the Defendant designed to inflict a high degree of pain and fear in the victim, with utter indifference to, or even enjoyment of, the suffering of this victim. Any murder of a defenseless victim is to some extent heinous, atrocious and cruel, but the degree of heinousness, atrociousness and cruelty, with which this offense was committed, exceeds that common to all capital offenses."
(C.R. 253-54.)
As evidenced from the above, the finding that the crime was especially heinous, atrocious, or cruel when compared to other capital offenses was based not only on the fact that the first bullet wound caused the victim intense pain, but also on the manner of the murder, as well as the fear and humiliation that the victim most certainly experienced before her death. These are appropriate factors to consider in determining the existence of this aggravating factor. See Ex parte Rieber, 663 So.2d 999
(Ala. 1995). Accordingly, the trial court did not err in allowing the jury to consider as an aggravating factor that the crime was especially heinous, atrocious, or cruel, nor did it err in finding the existence of this aggravating circumstance.
 VIII.
The appellant maintains that the trial court erred in denying his request to visit the scene of the crime with his attorneys. He argues that the trial court's refusal to allow him to visit the scene with his attorneys denied him the effective assistance of counsel.
In a pretrial motion hearing, the trial court denied the appellant's request to visit the scene of the crime with his attorneys. The trial court ruled that because the appellant was being held in jail without bond, the court could not allow the appellant to visit the scene without a compelling reason to do so; however, the trial court indicated that the appellant's counsel were free to visit the scene. The appellant did not offer the trial court any reason he needed to view the scene of the crime — other than his general assertion in his written motion that his presence at the scene was necessary to assist his counsel in the investigation of the crime — nor did he specifically explain how his defense would be prejudiced if he were not allowed to view the scene. Accordingly, we find no error in the trial court's denial of the appellant's motion to view the scene of the crime with his attorneys.
Moreover, the appellant has not established how the trial court's ruling denied him the effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, the appellant must show that his counsel's performance was deficient and that, but for his counsel's deficient performance, the result of the proceedings would have been different. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052,80 L.Ed.2d 674 (1984). The appellant has met neither prong of the two-pronged test set out in Strickland. The appellant does not indicate how the trial court's ruling rendered his counsel's performance deficient, nor does he explain how his viewing the scene of the crime with his attorneys *Page 1005 
could have changed the outcome of the proceedings. Accordingly, the appellant is due no relief on his assertion that the trial court's refusal to allow him to visit the scene denied him the effective assistance of counsel.
 IX.
The appellant contends that he was denied the effective assistance of counsel as a result of:
 "A. [T]he failure of trial counsel to object to impermissible closing arguments of the prosecutors during the guilt phase;
 "B. [T]he failure of trial counsel to object to impermissible closing argument of the prosecutors during the penalty phase;
 "C. [T]he failure of trial counsel to object to hearsay testimony by an alleged confidential informant;
 "D. [T]he agreement to stipulate to the admissibility of certain items of evidence without the state having to prove a proper chain of custody; and
 "E. The failure to object to the jury charge regarding `especially heinous, atrocious or cruel.'"
(Appellant's brief, p. 27.)
Pursuant to the procedure outlined in Ex parte Jackson, 598 So.2d 895
(Ala. 1992),[5] appellate counsel filed a motion for a new trial, in which counsel asserted, in very general terms, that the appellant had received ineffective assistance of trial counsel.[6] A hearing was conducted on the motion. During the hearing, appellate counsel advanced several of the above grounds in support of the appellant's contention that his trial counsel had been ineffective; however, neither the appellant nor his trial attorneys testified at the hearing. The trial court denied the appellant's motion for a new trial.
Although the appellant did not present all of the above allegations of ineffective assistance of counsel to the trial court, this Court is obliged to review the appellant's allegations pursuant to the plain error doctrine. Rule 45A, Ala.R.App.P.
 "In order to prevail on an ineffective assistance of counsel claim, a defendant must meet the two-pronged test set out by Strickland v. Washington, 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 2052 (1984).
 "`First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.'
"Id. at 687.
"`The performance component outlined in Strickland is an objective one: that is, whether counsel's assistance, judged under "prevailing professional norms," was "reasonable considering all the circumstances."'Daniels v. State, 650 So.2d 544, 552 (Ala.Cr.App. 1994) (quotingStrickland, 466 U.S. at 688). Once a defendant has identified the specific acts or omissions that allegedly were not the result of reasonable professional judgment on counsel's *Page 1006 
part, the court must determine whether those acts or omissions fall outside the wide range of professionally competent assistance. Id.
"When reviewing a claim of ineffective assistance of counsel, we indulge a strong presumption that counsel's conduct was appropriate and reasonable. Hallford v. State, 629 So.2d 6 (Ala.Cr.App. 1992), cert.denied, 511 U.S. 1100, 128 L.Ed.2d 491, 114 S. Ct. 1870 (1994); Luke v.State, 484 So.2d 531 (Ala.Cr.App. 1985).
 "`Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'
"Strickland, 466 U.S. at 689 (citations omitted). See Ex parte Lawley,512 So.2d 1370, 1372 (Ala. 1987).
"And, even if an attorney's performance is determined to be deficient, the petitioner is not entitled to relief unless it is also established that `there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' Strickland, 466 U.S. at 694.
"In an ineffective assistance of counsel claim, the burden is on the claimant to show that his counsel's assistance was ineffective. Ex parteBaldwin, 456 So.2d 129 (Ala. 1984), aff'd, 472 U.S. 372,86 L. Ed. 2d 300, 105 S.Ct. 2727 (1985)."
McNair v. State, [Ms. CR-95-0470, July 3, 1997] 706 So.2d 828
(Ala.Cr.App. 1997).
The appellant has met neither prong of the Strickland test. First, the appellant has not demonstrated that his trial counsel's performance was deficient. As noted, neither the appellant nor his trial attorneys testified at the hearing. The arguments of the appellant's counsel in support of the motion for a new trial are not evidence. Arnold v. State,601 So.2d 145, 154 (Ala.Cr.App. 1992). Without more, it is impossible to determine trial counsel's rationale for not objecting to the allegedly improper conduct or comments. Accordingly, the appellant has not "`overcome the presumption that, under the circumstances, [counsel's actions] "might be considered sound trial strategy."'" McNair, 706 So.2d at 839, quoting Strickland, 466 U.S. at 689.
Even if we were to assume for the sake of argument that counsel's performance was deficient, the appellant has not proven that he was prejudiced by counsel's performance. All of the claims underlying the appellant's allegations of ineffective assistance of counsel — with the exception of the claim "D" above — have been addressed elsewhere in this opinion and found to be without merit. Accordingly, the appellant has failed to prove that "`there is a reasonable probability that, but for [counsel's failure to object], the result of the proceeding would have been different.'" McNair, *Page 1007 
706 So.2d at 839, quoting Strickland, 466 U.S at 694.
In support of the appellant's allegation that his trial attorneys were ineffective for stipulating to the admissibility of certain evidence, the appellant refers this Court to a portion of the record in which counsel agreed to stipulate to the chain of custody on items of evidence which Investigator Glen Nunley "touched or helped bag." (R. 1317.) In that portion of the record, counsel also stipulated that it was not necessary to have the contract driver for the Department of Forensic Sciences, who transported the victim's body to and from the autopsy, testify as a chain of custody witness, and counsel stipulated to the identity of the deceased. Other than his broad assertion that there is no evidence that he agreed to the stipulations, and that any such stipulations should be considered ineffective assistance "as a matter of law" (Appellant's brief, p. 29), the appellant does not demonstrate how counsel's stipulations constituted ineffective assistance. Again, the appellant has failed to overcome the presumption that counsel's conduct fell "`within the wide range of reasonable professional assistance.'" McNair, 706 So.2d at 839, quoting Strickland, 466 U.S. at 689. Moreover, the appellant does not even say how he was prejudiced by counsel's stipulations, and any prejudice suffered as a result of counsel's stipulations is not apparent to this Court.
Because the appellant has met neither prong of the test set forth inStrickland, he is due no relief on his allegations of ineffective assistance of counsel.
 X.
Section 13A-5-53, Code of Alabama 1975, mandates that in addition to reviewing the case for any error involving the appellant's capital murder conviction, this Court must review the propriety of the death sentence.
 "This review shall include the determination of whether any error adversely affecting the rights of the defendant was made in the sentence proceedings, whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence, and whether death was the proper sentence in the case."
Section 13A-5-53(a).
Pursuant to Rule 45A, Ala.R.App.P., we have searched the entire record for any error that may have adversely affected the appellant's substantial rights, whether or not brought to our attention or to the attention of the trial court. We find no plain error in either the guilt phase or in the sentencing phase of the proceedings.
The trial court found the existence of two aggravating circumstances: that the murder was committed while the appellant was engaged in the commission of a robbery in the first degree or an attempt thereof, and that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses. § 13A-5-49(4) and (8), Code of Alabama 1975. The trial court found the existence of two statutory mitigating circumstances: the appellant has no significant history of prior criminal activity, and that the appellant was 19 years old at the time of the crime. § 13A-5-51(1) and (7), Code of Alabama 1975. With regard to the nonstatutory mitigating factors, the trial court found:
 "The court has also considered the aspects of the Defendant's character and record, and any of the circumstances of the offense that the Defendant has offered in mitigation. Specifically, the Court has considered the family background of the Defendant, the apparent troubles that he had in the public schools of this county, the fact that he was diagnosed at an early age with attention deficit disorder, and that he cooperated with the investigators following his arrest. The Court has also considered the numerous letters addressed to this Court by friends or acquaintances of *Page 1008 
the Defendant or of his family, most of which have requested this Court impose a sentence of life without parole."
(C.R. 256-57.) The trial court's findings reflect that it carefully weighed the aggravating and mitigating circumstances before sentencing the appellant to death. The trial court's findings are supported by the record.
Accordingly, because we find no plain error in either the guilt or the sentencing phase of the appellant's trial, and because we find that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the record, we must now determine whether death was the proper sentence. § 13A-5-53(a), Code of Alabama 1975. In so doing, § 13A-5-53(b), requires this Court to determine:
 "(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
 "(2) Whether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence; and
 "(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
We find no evidence that the appellant's sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. Our independent weighing of the aggravating and mitigating circumstances indicates that death is the proper sentence. Last, considering both the crime committed and the appellant, we find that the appellant's sentence is neither excessive nor disproportionate to the penalty imposed in similar cases. Indeed, "two-thirds of Alabama's death sentences have been imposed on defendants convicted of capital murder arising out of robbery-murder." McNair v. State, [Ms. CR-95-0470, July 3, 1997]706 So.2d 828 (Ala.Cr.App. 1997).
Accordingly, the appellant's conviction and sentence to death are due to be, and are hereby, affirmed.
AFFIRMED.
All the Judges concur.
[1] Testimony elicited in the suppression hearing indicated that the officers discovered that there was an outstanding warrant for the appellant's arrest for third-degree assault. This information was not provided to the jury.
[2] The state was represented at trial by the district attorney and an assistant district attorney. The assistant district attorney argued first for the state in closing, and the district attorney argued in rebuttal.
[3] The issue in Self was not whether the state had to disclose the identity of a confidential tipster; rather, the issue in Self
was whether the state had an obligation to secure the presence at trial of a state's informant, who was a material witness and whose identity was known by both the state and the defense.
[4] See § 13A-5-49(8), Code of Alabama 1975.
[5] In Ex parte Ingram, 675 So.2d 863 (Ala. 1996), the Alabama Supreme Court overruled Ex parte Jackson "to the extent that it allows a defendant's newly appointed appellate counsel to move to suspend the Rule 24.1(b), Ala.R.Crim.P., 30-day jurisdictional time limit for new trial motions." 675 So.2d at 865.
[6] The appellant was represented by different counsel at trial and on appeal.